ACCEPTED
01-17-00844-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/25/2018 2:07 PM
CHRISTOPHER PRINE
CLERK

# No. 01-17-00844-CV

## IN THE COURT OF APPEALS
## FOR THE FIRST DISTRICT OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/25/2018 2:07:54 PM
CHRISTOPHER A. PRINE
Clerk

**LESLIE R. POGUE AND JEANNETTE I. POGUE,** *Appellants*

**VS.**

**ELIZABETH A. WILLIAMSON,** *Appellee.*

*(On appeal from the 164th Judicial District
Court of Harris County, Texas,
Trial Court Cause No. 2012-56353)*

## BRIEF OF APPELLANTS,
## LESLIE R. POGUE AND JEANNETTE I. POGUE

**DE LANGE, HUDSPETH,
MCCONNELL & TIBBETS, L.L.P.**
**BEN A. BARING, JR.**
**STATE BAR NO. 01739050**
bbaring@dhmtlaw.com
**R. TRAVIS PIPER**
**STATE BAR NO. 24070421**
tpiper@dhmtlaw.com
**1177 WEST LOOP SOUTH, SUITE 1700**
**HOUSTON, TX 77027**
**PHONE: 713-871-2000**
**FAX: 713-871-2020**

**ATTORNEYS FOR APPELLANTS, LESLIE R. POGUE AND JEANNETTE I. POGUE**

**ORAL ARGUMENT REQUESTED**

# Identities of Parties and Counsel

| PARTIES | COUNSEL |
|---|---|
| **Appellants:** | **Trial Counsel:** |
| | Sharon E. Peebles |
| Leslie R. Pogue and | Attorney at Law |
| Jeannette I. Pogue | 1218 Potomac Dr., Unit A |
| | Houston, TX 77057 |
| | Phone: 713-289-4849 |
| | Fax: 713-583-6419 |
| | Email: peebleslaw@aol.com |
| | |
| | **Appellate Counsel** |
| | De Lange, Hudspeth, McConnell |
| | & Tibbets, L.L.P. |
| | Ben A. Baring, Jr. |
| | Email: bbaring@dhmtlaw.com |
| | R. Travis Piper |
| | Email: tpiper@dhmtlaw.com |
| | 1177 W. Loop South, Ste. 1700 |
| | Houston, TX 77027 |
| | Phone: 713-871-2000 |
| | Fax: 713-871-2020 |
| | |
| **Appellee:** | **Trial Counsel:** |
| | Scarlett C. May |
| Elizabeth A. Williamson | The May Law Firm |
| | 5607 Spring Lodge, Ste. 200 |
| | Kingwood, TX 77345 |
| | Phone: 713-502-6806 |
| | Fax: 281-360-4296 |
| | Email: themaylawfirm@aol.com |
| | |
| | **Trial and Appellate Counsel** |
| | Misty Hataway-Coné |
| | Spurlock & Associates |
| | 17280 West Lake Houston Pkwy. |
| | Humble, TX 77346 |
| | Phone: 281-548-0900 |
| | Fax: 281-446-5443 |
| | Email: MCone@spurlocklaw.com |

# Table of Contents

                                                                                          **PAGE**

Identities of Parties and Counsel ................................................................. ii

Table of Contents ..................................................................................... iii

Table of Authorities ..................................................................................vi

Statement of the Case ..................................................................................x

Statement Regarding Oral Argument ..........................................................xi

Record References ......................................................................................xi

Issues Presented ...................................................................................... xii

    1.    The trial court erred in entering judgment against the Pogues for damages under the Texas Deceptive Trade Practices Act because Williamson clearly and unequivocally disclaimed reliance on any statements or representations by the Pogues regarding the condition of the property. ................................................. xii

    2.    Because Williamson clearly and unequivocally disclaimed reliance on any statements or representations of the Pogues regarding the condition of the property, she cannot recover under common-law fraud, statutory fraud, or negligent misrepresentation theories of recovery. ........................... xii

    3.    The trial court erred in entering judgment extinguishing and releasing the lien on the property contained in the deed of trust, which secured the payment of Williamson's note to the Pogues for the purchase of the property. ....................................... xii

    4.    The damages awarded by the trial court judgment under the Texas Deceptive Trade Practices Act were improper even if Williamson had not disclaimed reliance. ........................... xii

    5.    The jury's answers to the damage questions related to fraud and negligent misrepresentation—Questions Numbers 4 and 11— cannot support the trial court's judgment........................................ xii

6. The judgment awarding attorney's fees should be reversed. ............. xii

Preliminary Statement.................................................................................1

Statement of Facts.......................................................................................2

Summary of the Argument.........................................................................13

Argument……………………………………………………………… 17

    I.    Williamson's disclaimer-of-reliance agreement prevents her from recovering under all of her causes of action. (Issue Nos. 1 and 2). .......................................................................................17

        A.    The disclaimer-of-reliance clause signed by Williamson is clear and unequivocal. ...........................................................23

        B.    The language was not boilerplate and the parties discussed the issue....................................................................................25

        C.    Williamson was represented by counsel in the transaction. ...................................................................................................29

        D.    Williamson and the Pogues dealt in an arm's length transaction and Williamson was knowledgeable about business matters. ........................................................................30

        E.    Because of the disclaimer-of-reliance language, Williamson cannot recover under any of her tort theories as a matter of law. .................................................................32

    II.    The trial court's judgment extinguishing the Pogues' deed of trust lien is a misapplication of Texas law and constitutes reversible error. (Issue No. 3)...........................................................33

        A.    Williamson's debt to the Pogues has not been extinguished and currently exists. ...............................................................35

        B.    The Pogues' right to foreclose is not barred by the applicable statute of limitations. ............................................37

    III.    The DTPA damages awarded by the trial court were improper. (Issue No. 4). ................................................................................39

        A.    The trial court erred in entering its judgment for additional damages of $327,500 because this award does not conform to the jury's verdict. ..............................................................39

B. The trial court erred in awarding both loss of the benefit-of-the-bargain damages and out-of-pocket damages under the DTPA, as the award constitutes a double recovery. ...........41

C. The trial court erred in including future benefit-of-the-bargain and out-of-pocket damages in the actual damages awarded under the DTPA........................................................43

D. The trial court erred in entering judgment awarding benefit-of-the-bargain damages under the DTPA because there was no evidence of the property's value as it was received by Williamson. ..........................................................45

E. The trial court erred in entering judgment for future out-of-pocket damages, future expenses, and future lost time damages................................................................................46

IV. The trial court's judgment cannot be supported by the jury's answers to the damages questions related to fraud and negligent misrepresentation—jury Question Nos. 4 and 11. (Issue No. 5) ........48

A. There is no evidence to support the benefit-of-the-bargain damages awarded for fraud and negligent misrepresentation. ..................................................48

B. There is no evidence to support the jury's award of future fraud and negligent misrepresentation damages.......................50

C. There is no evidence to support the jury's award of past remedial damages, mitigation expenses, and economic loss................................................................................52

V. Because the trial court erred in entering judgment against the Pogues, the court's award of attorney's fees should be reversed. (Issue No. 6) ....................................................................................57

Prayer for Relief................................................................................58

Certificate of Service .......................................................................59

Certificate of Compliance ................................................................59

Appendix...........................................................................................60

# Table of Authorities

**Page**

**CASES**

*Abry Partners V., L.P. v. F and W Acquisition, L.L.C.,*
891 A.2d 1032 (Del. 2006)...................................................................................22

*Allen v. Devon Energy Holdings, LLC,*
367 S.W.3d 355 (Tex. App.—Houston [1st Dist.] 2012, pet. granted,
judgm't vacated w.r.m.)............................................................ 18, 21, 22, 25

*Arthur Andersen & Co. v. Perry Equip. Corp.,*
945 S.W.2d 812 (Tex. 1997). .......................................................... 42, 44, 50

*Atlantic Lloyds Ins. Co. v. Butler,*
137 S.W.3d 199 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)..........21

*Bever Properties, LLC v. Jerry Huffman Custom Builder, L.L.C.,*
No. 05-13-01519-CV, 2015 WL 4600347 (Tex. Civ. App.—Dallas, July 31,
2015, no pet.) ....................................................................................................27

*Boat Superstore v. Haner,*
877 S.W.2d 376 (Tex. App.—Houston [1st Dist.] 1994, no pet.)................41

*Fazio v. Cypress/GR Houston I, L.P.,*
403 S.W.3d 390 (Tex. App.—Houston [1st Dist.] 2013, no pet.).......... 44, 50

*Federal Land Bank Ass'n of Tyler v. Sloane,*
825 S.W.2d 439 (Tex. 1991) .........................................................................55

*FFE Transp. Servs., Inc. v. Fulgham,*
154 S.W.3d 84 (Tex. 2004) ............................................................................53

*Foley v. Parlier,*
68 S.W.3d 870 (Tex. App.—Ft. Worth 2002, no pet.).................................43

*Forest Oil Corp. v. McAllen,*
268 S.W.3d 51 (Tex. 2008) ................................................................. passim

*Goldfrank, Frank & Co. v. Young,*
64 Tex. 432 (1885) ..................................................................................... 36, 37

*Gulf States Utilities Co. v. Low,*
　　79 S.W.3d 561, 567 (Tex. 2002) ...............................................................57

*Gym-N-I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 912 (Tex. 2007) ..............22

*Henry Schein, Inc. v. Stromboe,*
　　102 S.W.3d 675 (Tex. 2002) .......................................................................33

*Holman Street Baptist Church v. Jefferson,*
　　317 S.W.3d 540 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) .......37

*Hong v. Nations Renovations, LLC*,
　　No. 05-15-01036-CV, 2016 WL 7473900, (Tex. Civ. App.—Dallas, Dec.
　　29, 2016, no pet.) ........................................................................................27

*Houston Lighting & Power Co. v. Fisher,*
　　559 S.W.2d 682 (Tex. App.—Houston [14th Dist.] 1977,
　　writ ref'd n.r.e.)................................................................................... 46, 49

*Houston v. Ludwick,*
　　No. 14-09-00600-CV, 2010 WL 4132215 (Tex. App.—Houston [14th Dist.]
　　2010, pet. denied) .......................................................................................46

*Hughes v. Mahaney & Higgins*,
　　821 S.W.2d 154 (Tex. 1991) .......................................................................38

*Huynh v. Phung,*
　　No. 01-04-00267-CV, 2007 WL 495023 (Tex. App.—Houston [1st Dist.]
　　Feb. 16, 2007, no pet.) ................................................................................43

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America,*
　　341 S.W.3d 323 (Tex. 2011) ................................................................ 21, 22

*Jerry L. Starkey, TBDL, L.P. v. Graves,*
　　448 S.W.3d 88, 112 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ........58

*Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.,*
　　814 S.W.2d 553 (Tex. App.—Houston [1st Dist.] 1991, no writ) ......... 47, 51

*Larsen v. Carlene Langford & Assocs., Inc.,*
　　41 S.W.3d 245 (Tex. App.—Waco 2001, pet. denied) ................................33

*Latham v. Castillo,*
    972 S.W.2d 66 (Tex. 1988) ...............................................................43

*Leyendecker & Assocs. v. Wechter,*
    683 S.W.2d 369 (Tex. 1984) ...................................................... 44, 50

*Martin v. McKee Realtors,*
    663 S.W.2d 446 (Tex. 1984) .............................................................41

*McGinty v. Hennen,*
    372 S.W.3d 625 (Tex. 2012) ...................................................... 46, 49

*McIver v. Gloria,*
    140 Tex. 566, 169 S.W.2d 710, 712 (1943) ............................... 47, 51

*McLernon v. Dynegy, Inc.,*
    347 S.W.3d 315 (Tex. App.—Houston [14th Dist.] 2011, no pet.) . 21, 27, 28

*Phillips v. Phillips,*
    820 S.W.2d 785 (Tex. 1991) .............................................................40

*Pioneer Bldg. & Loan Ass'n v. Johnston*,
    117 S.W.2d 556 (Tex. Civ. App.—Waco, 1938, writ dism'd) .....................39

*Pjetrovic v. Home Depot,*
    411 S.W.3d 639 (Tex. App.—Texarkana 2013, no pet.) ..............................53

*Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,*
    896 S.W.2d 156 (Tex. 1995) .............................................................33

*Roth v. Law,*
    579 S.W.2d 949 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.) ..47

*Salomon v. Lesay,*
    369 S.W.3d 540 (Tex. App.—Houston [1st Dist.] 2012, no pet.)................40

*Schlumberger Tech. Corp. v. Swanson,*
    959 S.W.2d 171 (Tex. 1997) ............................................... passim

*Walker v. Hanes*,
    570 S.W.2d 534 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.) ..38

*Williams v. Dardenne,*
    345 S.W.3d 118 (Tex. App.—Houston [1st Dist.] 2011, no pet.)..................33

*Woodyard v. Hunt,*
    695 S.W.2d 730 (Tex. App.—Houston [1st Dist.] 1985)....................... 44, 50

*Wortham Bros., Inc. v. Haffner,*
    347 S.W.3d 356 (Tex. App.—Eastland 2011, no pet.)..................................53

## STATUTES

TEX. BUS. & COM. CODE ANN. § 17.50(b)(1) .......................................................40

TEX. BUS. & COM. CODE ANN. § 17.50(d) .............................................................57

TEX. BUS. & COM. CODE ANN. § 27.01(d) .............................................................57

TEX. BUS. & COM. CODE ANN. § 17.50(a) .............................................................42

TEX. CIV. PRAC. & REM. CODE § 16.035(b) ............................................................34

## OTHER AUTHORITIES

RESTATEMENT (2ND) OF TORTS § 552B (1977)...........................................................55

## RULES

TEX. R. APP. P. 9.4(i)(1).......................................................................................59

TEX. R. CIV. P. 301 ..............................................................................................39

## Statement of the Case

**Nature of the Case:** Williamson bought a 33-year old vacant house and 4.5 acres from the Pogues for $235,000. Williamson agreed that she was taking the property "as is" with all latent and patent defects and that she was relying solely on her examination of the property, and not upon any representations by the Pogues regarding the property's condition.

Two years after purchasing the property Williamson sued the Pogues, her real estate agent, and the agent's firm alleging various tort theories of recovery related to misrepresentations regarding the property's condition. I CR 4.

**Trial Court:** Hon. Alexandra Smoots-Thomas, 164th Judicial District Court of Harris County, Texas

**Course of Proceedings and Trial Court's Disposition:** The trial court granted the agent's and real estate firm's motion for summary judgment. II First Supp. CR 435. The court also initially granted the Pogues' motion for summary judgment but later vacated its order. III First Supp. CR 814, 830. Williamson's claims against the Pogues were tried to a jury, and the jury answered questions favorable to Williamson. Tab A, III First Supp. CR 869. The trial court entered judgment against the Pogues for damages, prejudgment interest, and attorneys' fees totaling $760,769.67. The judgment also extinguished the Pogues' deed of trust lien that secured Williamson's note for the property's purchase. Tab B, III First Supp. CR 902.

## Statement Regarding Oral Argument

Appellants request that the Court hear oral argument. Oral argument is desirable because the record is lengthy and there are numerous exhibits. Oral argument will assist the Court in clarifying the issues and explaining the facts.

## Record References

References to the record are denoted by the following:

| | |
|---|---|
| Clerk's Record | [volume] CR [page(s)] |
| Reporter's Record | [volume] RR [page(s)] |

The Reporter's Record contains two volumes designated "6 of 11". To avoid confusion, in this brief the volume number for the testimony taken on May 9, 2017 is referred to as "6A", and the volume number for the testimony taken on May 10, 2017 is referred to as "6B".

| | |
|---|---|
| Williamson trial exhibits | PX [number] |
| Pogues' trial exhibits | DX [number] |

## Issues Presented

1.     The trial court erred in entering judgment against the Pogues for damages under the Texas Deceptive Trade Practices Act because Williamson clearly and unequivocally disclaimed reliance on any statements or representations by the Pogues regarding the condition of the property.

2.     Because Williamson clearly and unequivocally disclaimed reliance on any statements or representations of the Pogues regarding the condition of the property, she cannot recover under common-law fraud, statutory fraud, or negligent misrepresentation theories of recovery.

3.     The trial court erred in entering judgment extinguishing and releasing the lien on the property contained in the deed of trust, which secured the payment of Williamson's note to the Pogues for the purchase of the property.

4.     The damages awarded by the trial court judgment under the Texas Deceptive Trade Practices Act were improper even if Williamson had not disclaimed reliance.

5.     The jury's answers to the damage questions related to fraud and negligent misrepresentation—Questions Numbers 4 and 11—cannot support the trial court's judgment.

6.     The judgment awarding attorney's fees should be reversed.

**Preliminary Statement**

The Pogues appeal a $760,000 judgment holding them liable for misrepresenting the condition of a thirty-three-year-old house that Williamson purchased "as is" and with all patent and latent defects, and with an agreement that she was relying solely on her own examination of the property and not on any representations, statements, assertions, or non-assertions by the Pogues related to the property's condition.

The real basis of this dispute was the Pogues' refusal to grant Williamson an extension of time to make her final balloon payment on the owner-financed note that Williamson owed to the Pogues. The Pogues, who are retired and now live in Bellville, Texas, agreed to owner-finance Williamson's purchase of the property, but only for two years. Williamson made her regular monthly payments to the Pogues during the two-year period and never complained to them about any problems with the house, although she had every opportunity to do so.

But all of this changed several weeks before Williamson's note came due. Williamson asked for the Pogues to extend the date of her final payment (the balance of the note) and when the Pogues wouldn't agree, Williamson hired an attorney, who sent a letter demanding that the Pogues grant the extension. For the first time, the letter also notified the Pogues that there were problems with the house, and that

1

Williamson had been repairing it for two years. On the day Williamson's final payment was due, she sued the Pogues, alleging that they had defrauded Williamson.

The overarching issue is whether Williamson may recover any amount from the Pogues, when Williamson affirmatively agreed to rely solely on her own investigation of the property and not on any representations of the Pogues related to the property's condition.

**Statement of Facts**

Leslie R. Pogue and Jeannette I. Pogue owned a thirty-three-year-old house on 4.5 acres at 901 Indian Shores Road in Crosby, Texas. 2 RR 185. The Pogues were the fifth or sixth owners of the property, having purchased it in 2000. 6B RR 180, 219. The property was fenced, included a pecan orchard, and had room for horses and other animals to roam. 2 RR 185, 233-34. Here is a picture of the Indian Shores property, for demonstrative purposes:



In September 2008, Hurricane Ike battered the Texas Gulf Coast. Many homes were damaged, including the Pogues' property, and the Pogues made an insurance claim for $33,000. 6B RR 90. The Pogues received $25,0156 on this claim. 6B RR 206. They spent $18,700 to replace the roof, and had the house repainted, replaced some sheetrock, and repaired some outside trim. 10 RR PX 20, 6B RR 89-90. Mr. Pogue was his own general contractor and he testified that his subcontractors made all the repairs required by the insurance company and that the insurance company would not have paid the claims until they made sure the repairs had been completed. 6B RR 202.

The Pogues lived in the Indian Shores property until March 2009 when they moved to Bellville, Texas. 6B RR 181. Shortly after moving, the Pogues put the property up for sale, and at first attempted to sell the property without a realtor. 7 RR 45-46. The property didn't sell, and in September 2009 they retained Gina Jones as a realtor in an effort to sell the property. 2 RR 237. Ms. Jones helped the Pogues with the property listing, took photos of the house, and suggested that the Pogues repaint the inside. 7 RR 46-47.

The Indian Shores property was vacant for nearly a year and a half when Lewis Walker, Elizabeth Williamson's future husband, noticed that the property was for sale. Walker wanted to buy the property, but because of his poor credit he couldn't qualify for a loan, and instead the Pogues agreed to rent the property to him.

Walker then moved boxes in the house. 2 RR 207, 218-19, 6A RR 71. Williamson, who was Walker's fiancée, went with Walker when he looked at the property before he rented it. 6A RR 34, 257. Williamson was aware of the Indian Shores property because she lived two streets over in a double-wide trailer. 6A RR 76-77.

She knew about the Pogues' property and had always liked it because it was, as she put it, an "iconic" property in the area. 6A RR 34-35. As Williamson testified: "It wasn't so much just the house. It was just—the land and everything, the way it was set up. It was just a really nice property." 2 RR 191. "Everybody always talked about it [the property], the way it sat off the road, and the yard, the way—it had just a really deep inset.  The way that the property was set up, it just was really nice, and the Pogues had added pecan trees, which really gave it a little bit of extra attraction". 6A RR 35.

After the Pogues' had rejected Walker's offer to purchase the property (and after the Pogues agreed to lease the property to Walker) Williamson decided to make an offer to purchase the Indian Shores property herself. 6A RR 35. Before purchasing it, Williamson was only at the property two times and the Pogues were not present either time. The first time Williamson went to the property was when Walker was interested in making an offer to purchase it. The second time was when Williamson herself made the offer to purchase the property. 6A RR 257.

Williamson and the Pogues initially into an earnest money contract for the sale of the Indian Shores property. 10 RR PX 2. The sales price was $235,000, and the Pogues agreed to owner-finance $210,000 for two years. 10 RR PX 2, par. 4C. Williamson agreed in the earnest money contract that she was accepting the property in its present condition:

D. ACCEPTANCE OF PROPERTY CONDITION: (Check one box only)
☒ (1) Buyer accepts the Property in its present condition.
☐ (2) Buyer accepts the Property in its present condition provided Seller, at Seller's expense; shall complete the following specific repairs and treatments: _____

10 RR PX 2, ¶ D(1). The contract also provided that Williamson could have the property inspected by inspectors she selected, but Williamson decided not to have the property inspected. 6A RR 74, 215.

When Williamson looked at the house before she purchased it, the property was vacant, as the Pogues had moved out nearly a year and a half before. 2 RR 255, 6B RR 181. When Williamson saw the property for the first time, it was filthy, and the garage was full of debris. 6B RR 32-33. The yard was very overgrown to the point that Williamson couldn't even tell that there was any landscaping. 2 RR 255. Although the house was vacant, it still had belongings in it and Williamson testified that the barn on the property looked "Silence of the Lambs" scary as it had "needles and syringes on the ground, and on tables". 2 RR 256. Williamson also noticed that the pool on the property was pitch black, like it had not been maintained for years, to the point that you could not see the bottom of the pool. 2 RR 256. Inside the house,

5

Williamson testified that in addition to a lot of "stuff" still being in the house, the carpet was "really disgusting and gross" and Williamson noted that the house had a musty odor, which her realtor told her was because the air conditioners had been stolen and because the property had been closed up. 2 RR 258.

Before purchasing the property, Williamson attempted to obtain property insurance, during that process she learned from her insurance company that a wind claim had previously been made on the property. 3 RR 156, 6A RR 78. In addition, before Williamson closed on the purchase, she asked her realtor about insurance claims and was told that the Pogues had replaced the roof on the house after Hurricane Ike. 6A RR 82.

The closing on the property occurred on September 10, 2010. 10 RR PX 7. Williamson signed a two-year note to the Pogues for $210,000, and the note provided for a final balloon payment for the full amount in twenty-four months. 10 RR PX 5. So that there would be no question as to when the note came due, the note included a bold, underlined notice to Williamson:

**NOTICE TO MAKER:**

**THIS LOAN IS PAYABLE IN FULL ON SEPTEMBER 25, 2012.**

YOU MUST PAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE.  THE PAYEE IS UNDER NO OBLIGATION TO REFINANCE THE LOAN AT THAT TIME.  YOU WILL THEREFORE BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER WILLING TO LEND YOU THE MONEY AT PREVAILING MARKET RATES, WHICH MAY BE CONSIDERABLY HIGHER OR LOWER THAN THE INTEREST RATE ON THIS LOAN.  IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL CLOSING CO STS NORMALLY ASSOCIATED WITH A NEW LOAN, EVEN IF YOU OBTAIN REFINANCING FROM THE PAYEE.

Each Maker is responsible for all obligations represented by this note.

When the context requires, singular nouns and pronouns include the plural.

THIS INSTRUMENT WAS PREPARED FROM INFORMATION FURNISHED BY THE PARTIES AND NO EXAMINATION HAS BEEN MADE AND NO OPINION HAS BEEN GIVEN BY THE ATTORNEY PREPARING THIS INSTRUMENT AS TO THE TITLE TO OR THE DESCRIPTION OF THE PROPERTY INVOLVED.

**ELIZABETH A. WILLIAMSON,**
an unmarried woman

10 RR PX 5, p. 4.

Williamson also signed a deed of trust securing the Pogues' note, showing a final maturity date of September 25, 2012. 10 RR PX 6. The Pogues signed a warranty deed with vendor's lien, conveying the property to Williamson. 10 RR PX 7. Williamson also signed the deed as Grantee, agreeing to accept the deed and consenting to its form and substance, and acknowledging that the terms of the deed conformed with her intent. She further agreed to the obligations imposed on her by

the terms of the deed, the accompanying real estate lien note, and deed of trust. 10

RR PX 7, p. 5:

**ACCEPTANCE BY GRANTEE**

Grantee, accepts the foregoing deed and consents to its form and substance. Grantee acknowledges that the terms of the deed conform with Grantee's intent and that they will control in the event of any conflict with the contract Grantee signed regarding the Property described in the deed.

Grantee agrees to the obligations imposed on Grantee by the terms of the deed, and accompanying real estate lien note and deed of trust.

**ELIZABETH A. WILLIAMSON,**
**an unmarried woman**

One paragraph in the deed is particularly important in this appeal. The deed included a detailed paragraph, in which Williamson agreed that she purchased the property "as is" and provided that Williamson was not relying on any representations, statements, assertions or non-assertions by the Pogues with respect to the property's condition, and that she was instead relying *solely* on her own examination of the property:

As a material part of the consideration for the Property, Grantor has executed this deed and granted, sold and conveyed the above described property, premises and improvements, and Grantee has accepted this deed and purchased the above-described property, premises and improvements, "AS IS." Grantor and Grantee agree that Grantee is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Grantor that the Property is fit for a particular purpose. Grantee acknowledges that Grantee is not relying upon any representations, statements, assertions or non-assertions by the Grantor with respect to the Property condition, but is relying *solely* on Grantee's examination of the Property. Further, Grantee takes the Property under the express understanding there are no express or implied warranties (except for limited warranties of title set forth herein and in the closing documents).

10 RR PX 7, p. 3.

Williamson also signed a document acknowledging that the attorney who prepared the closing documents—Donna Heinlein—was instructed by Williamson to refrain from doing nineteen specific actions, including ordering a title policy for her, ordering a survey, ordering a title search, having a termite inspection, and/or having experts inspect the premises and/or appliances, ascertaining whether or not the property was in a 100-year flood zone, or ascertaining whether there were any drainage problems or drainage easements. 10 RR PX 10, 10A-10D.

At closing, the Pogues paid $350 for a residential service contract for Williamson. 6 RR 243-44, 10 RR PX 4, p. 2, ln. 1305.

Williamson and her husband moved into the Indian Shores property in mid-October 2010. 2 RR 218. Shortly after they closed, Williamson began to discover problems with the house. Williamson testified that they discovered that some of the electrical outlets were not in working order and various light fixtures had switch

9

problems. 2 RR 219-20. She found wood rot under the hall bathroom carpet and behind the bathroom cabinet wall. 2 RR 221-23, 6A RR 101-02, 6B RR 87. Williamson testified that she then began to discover that there was mold in parts of the walls in some of the rooms in the home, which she bleached, and wood rot in many of the rooms behind the walls. 6A RR 105-27. There was also some termite damage behind the bathtub in one of the bathrooms, but there were no live termites. 6A RR 105-06. Williamson also testified that she found out that one of the septic tanks was improperly installed under the kitchen that caused some leakage. 6A RR 132-134. Williamson and Walker replaced the rotten wood that they found in the rooms and put new sheetrock and insulation up where necessary, with Walker doing the repair work himself. 6A RR 108-1545, 6B RR 124. Walker testified that he repaired "almost the entire house." 6B RR 144-45.

Despite Williamson knowing about the problems she found in the house immediately after moving in (in October 2010), she never notified or complained to the Pogues about these problems until two years later in 2012, when her final note payment was due on September 25, 2012. 3 RR 155, 6B RR 87.

Shortly before this payment was due (and before mentioning any problems existed in the house), Williamson contacted Mrs. Pogue by email and asked her if she could have an extension on the final payment. 3 RR 157. After thinking about it, the Pogues decided that they did not want to extend the payment. It was only then

that Williamson explained that "there were some problems" with the house that she had been living in and repairing for two years. 3 RR 157-58. Williamson then hired an attorney to send a letter to the Pogues complaining that (1) the Pogues did not provide disclosures of the condition of the residence, (2) the septic tanks were not up to code, (3) there was extensive bug infestation, including termites and (4) there was mold throughout the residence. The letter indicated that Williamson could not make the final note payment and requested an eighteen-month extension of the note, at which time she would pay the note in full. II First Supp. CR 620, 10 RR PX 11.[1]

No agreement was reached between the parties and on the date that the final balloon payment was due, Williamson sued the Pogues, along with Williamson's realtor, Gina Jones, and Alliance Properties, the real estate company. I CR 4. The basis of Williamson's complaint against the Pogues was her assertion that the Pogues failed to disclose to her that there was wood rot, termite damage, and other water damage in the home. I CR 4, ¶ 16. Williamson testified that her complaint was with the representations that the Pogues made in the seller's disclosure. 6B RR 114-15. she testified that the Pogues never otherwise represented the property's condition to her, and she even denied that she relied on the Pogues. 6A RR 218, 6B RR 44.

---

1   This exhibit admitted at trial is shown as being "retained by counsel" and therefore a copy is not in the reporter's record on file as of the filing of this brief. (A copy is located in the First Supp. Clerk's Record, as cited above). A supplemental reporter's record with this exhibit and all other exhibits retained by Williamson's counsel will be filed when all of the retained exhibits are compiled by the court reporter.

Williamson's realtor and the real estate company filed a motion for summary judgment, which the trial court granted. I First Supp. CR 143, II First Supp. CR 435. Among the bases of the realtors' motion for summary judgment was that the earnest money contract and warranty deed both made it clear that Williamson purchased the Indian Shores property "as is" and that she was relying solely on her own examination, and not any other representations. I First Supp. CR 156-58.

The Pogues filed their own motion for summary judgment. II First Supp. CR 437. The Pogues asserted that all of Williamson's causes of action were precluded by the language in the purchase contract and deed. The court initially granted the Pogues' motion, but the court later vacated its order. III First Supp. CR 814, 830.

The case proceeded to trial in April 2017. After a day and a half of testimony, the parties announced that a settlement had been reached. 3 RR 205. But before the settlement documents were drafted and signed, the settlement was withdrawn, and the trial court started another trial with a different jury. 6 RR 4.

After Williamson rested, she moved for a trial amendment, seeking a declaratory judgment that the deed of trust lien granted by Williamson to secure her indebtedness to the Pogues was extinguished. 7 RR 71. The court then granted a directed verdict on Williamson's trial amendment, and declared that the Pogues' lien was extinguished. 7 RR 71-73. This trial amendment and request for directed verdict was based on Williamson's claim that the Pogues had no right to enforce their lien

12

because they had waived and abandoned their breach of contract counterclaims, where the Pogues sought to recover the amounts owing on the promissory note.

Williamson's tort claims were submitted to the jury and the jury returned a verdict in favor of Williamson. Tab A, III First Supp. CR 869-901. The court signed a final judgment, awarding Williamson $496,250 in damages, exclusive of attorney's fees and prejudgment interest, $171,972.23 in trial attorney's fees, $80,297.44 in pre-judgment interest, and $12,250 in appellate attorney's fees. Tab B, III First Supp. CR 902-06.

## Summary of the Argument

Williamson agreed to purchase the Indian Shores property from the Pogues "as is" and also agreed to a clear and unequivocal disclaimer-of-reliance provision in her deed. Williamson agreed to rely *solely* on her own investigation of the property's condition, and she agreed not to rely on any representation, statement, assurance, or non-assurance made by the Pogues. Williamson's disclaimer-of-reliance and her agreement to purchase the property "as is" prevents her from recovering under any of her alleged causes of action—fraud, negligent misrepresentation, or the Texas Deceptive Trade Practices Act.

Thus, the judgment against the Pogues—for in excess of $760,000—was improper.

The portion of the judgment that voided the Pogues' deed of trust lien on the property that secured Williamson's note to the Pogues was also improper. The court

13

improperly concluded that the waiver of the Pogues' counterclaims on the note also waived their right to foreclose on the deed of trust lien. Texas law is clear that even if a suit on the debt is barred, this fact does not prevent the lienholder from non-judicially foreclosing under the terms of the deed of trust. Here, the Pogues had posted the property for foreclosure but they were enjoined from foreclosing on their lien while this suit was pending. The judgment voiding their lien should be reversed and judgment rendered dissolving this injunction, and allowing the Pogues to enforce the terms of the deed of trust.

The damages awarded in the judgment—which were awarded under the DTPA—have no support in the evidence. First, the judgment awards $327,500 in "additional damages" based on the jury's "knowing" finding. This was error because the jury only awarded $2,500 in additional damages for the "knowing" conduct. Furthermore, the trial court erred in granting $163,750 in actual damages, as this total includes both benefit-of-the-bargain and out-of-pocket damages. An award of both of these types of damages constitutes a double recovery, and under Texas law a plaintiff may not recover both.

In addition, the court erred in awarding benefit-of-the-bargain damages that Williamson would sustain in the future. This damage award was improper because the damages are properly measured by comparing the value represented and received at the time of sale, not at some future time. Moreover, there was no support for *any*

benefit-of-the-bargain damages because Williamson provided no evidence of the property's value as it was received in September 2010 when she purchased it. Without such evidence there is no support for the benefit-of-the-bargain damages awarded by the court.

Similarly, the court's award of future out-of-pocket damages, future expenses, and future lost time damages have no support in the evidence. Williamson provided no evidence to support her claim to future damages, and instead she offered vague testimony that some specified rooms in the house "haven't been touched". There was no evidence of the time, expenses, or future out-of-pocket costs that she claimed would be necessary in the future.

The damages that were awarded by the court were based on the DTPA, but the jury also answered questions regarding fraud and negligent misrepresentation. The trial court's judgment cannot be supported by the jury's answers on these alternative theories for similar reasons to those that bar the recovery under the DTPA.

First, Williamson's fraud and negligent misrepresentation claims are barred because of her agreement to purchase the property "as is" and her disclaimer-of-reliance agreement. In addition, there was no evidence to support the loss of the benefit-of-the-bargain damages for fraud or negligent misrepresentation because Williamson presented no evidence of the value of the Indian Shores property on the

15

date she purchased it. The only evidence Williamson submitted was an HCAD appraisal district statement that reflected a value in 2013, but this constitutes no evidence of the property's value in 2010, when Williamson purchased it.

Also, the future benefit-of-the-bargain damages awarded by the jury under the fraud Question 4(2) cannot support a judgment these damages are properly measured at the time of the purchase, not at some future time.

Similarly, all of the future damages awarded by the jury in Questions 4(2), 4(4) and 4(6), as well as the future economic loss damages awarded in Question 11 (negligent misrepresentation) are improper for the reason that there is no evidence to support the future damages. Williamson provided no evidence as to the labor or materials that would be necessary in order to complete any repairs and without such evidence the damages awarded were based on pure speculation.

Finally, the award of past remedial damages in Question 4(3), the award of past mitigation expenses in Question 4(5), and the award of past economic loss in Question 11 are not supported by any evidence. These repairs were conducted over the two-year period after Williamson purchased the property and involved specialized or technical knowledge that require expert testimony. Williamson admitted that she and her husband were not professionals and that they did all the work themselves. As such, there is no competent evidence that the repairs were necessary and reasonable. Williamson's testimony regarding the labor costs incurred

16

was not competent evidence, as she testified that she obtained these labor costs from a website that advertised what contractors charged in the area and that she only charged the Pogues one-third of the contractors' amount because she "thought that would be fair". Because there was no competent evidence to support these amounts, the jury's answers regarding future remedial damages, mitigation expenses, and economic loss—Questions 4(3), 4(5), and 11—cannot support a judgment in Williamson's favor.

Because the judgment in Williamson's favor is improper, the court's judgment awarding attorney's fees is also improper.

## Argument

### I. Williamson's disclaimer-of-reliance agreement prevents her from recovering under all of her causes of action. (Issue Nos. 1 and 2).

Williamson signed a broad disclaimer-of-reliance provision, agreeing that she was not relying on any representation, statement, assertion or non-assertion by the Pogues as to the property's condition and that she was relying solely on her own examination of the property. [2] 10 RR PX 7. Texas courts, including the Supreme Court, have enforced disclaimers of reliance that contain language virtually identical to the disclaimer of reliance signed by Williamson. These cases all stand for the

_____

2   Williamson also agreed, in the earnest money contract she signed, to accept the property "as is". Her agreement to purchase the property "as is" is repeated in the disclaimer-of-reliance paragraph contained in the deed. For purposes of this brief, the term "disclaimer-of-reliance" includes the "as is" language.

17

general proposition that parties to an agreement can prevent future claims of fraud, negligent misrepresentation, or liability under the DTPA by including contract language that clearly and unequivocally disclaims reliance. *Allen v. Devon Energy Holdings, LLC,* 367 S.W.3d 355, 376 (Tex. App.—Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.).

The Texas Supreme Court has discussed disclaimer-of-reliance clauses in two cases: *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171 (Tex. 1997) and *Forest Oil Corp. v. McAllen,* 268 S.W.3d 51 (Tex. 2008). The threshold requirement for an effective disclaimer of reliance is that the language must be "clear and unequivocal" in its expression of the parties' intent to disclaim reliance. *See Schlumberger,* 959 S.W.2d at 179-80, *Forest Oil,* 268 S.W.3d at 62. This requirement for precise language ensures that parties to a contract understand that the contract's terms disclaim reliance, such that the contract may be binding even if it was induced by fraud. In both *Schlumberger* and *Forest Oil*, the Supreme Court held that the language used was clear and unequivocal in disclaiming reliance.

In *Schlumberger,* Schlumberger and the Swansons agreed to a release of claims in order to settle a dispute involving an underwater diamond-mining project off the South African coast. The Swansons sold their interests in the venture to Schlumberger for roughly $1 million, and the parties signed a settlement agreement that included a disclaimer-of-reliance provision:

> Each of us … expressly warrants and represents … that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment….

959 S.W.2d at 180.

After learning that Schlumberger later sold the interests it acquired in the settlement for about $4 million, the Swansons sued, claiming Schlumberger had fraudulently induced them to accept the low-price buyout. They claimed that when Schlumberger entered into the settlement it knew that the Swansons' interest had far higher value. *Id.*

For purposes of its decision, the Supreme Court assumed that Schlumberger had misrepresented the project's technological feasibility and commercial viability and that such misrepresentations were actionable as fraud. *Id.* at 178. Nevertheless, the Court concluded that the disclaimer of reliance that the Swansons gave conclusively negated the element of reliance and prohibited their recovery. *Id.* at 180. The Court reasoned that the Swansons, in clear language, had unequivocally disclaimed reliance upon Schlumberger's representations and agreed that they were relying on their own judgment. *Id.*

Eleven years later in *Forest Oil,* the Court again addressed whether an unambiguous disclaimer-of-reliance provision precluded a fraudulent inducement claim as a matter of law. The suit involved a dispute over oil and gas royalties, and

the case was settled at mediation. The settlement agreement in question expressly stated that neither of the parties was relying on any statement or representation of the other party and that each party was relying on their own judgment in signing the document:

> [We] expressly represent and warrant ... that no promise or agreement which is not herein expressed has been made to them in executing the releases contained in this Agreement, and that they are not relying upon any statement or representation of any of the parties being released hereby. [We] are relying upon [our] own judgment ….

268 S.W.3d at 54 n.4.

In reaching its conclusion that the disclaimer-of-reliance clause clearly and specifically negated the plaintiff's fraud claims, the *Forest Oil* court noted that the *Schlumberger* decision was relatively similar and rested on the paramount principle that Texas courts should uphold contracts that are negotiated at arms' length and that when parties elect to include a disclaimer-of-reliance provision in their agreement, the Court will generally enforce it. 268 S.W.3d at 58.

After *Schlumberger*, the courts of appeals seemed to disagree over which facts were most relevant in determining if a waiver-of-reliance provision was binding, and the *Forest Oil* Court clarified the Court's reasoning. *Forest Oil* identified five factors as a part of the totality of the circumstances that courts should consider in determining the validity of a contractual disclaimer: whether the disclaimer is "clear and unequivocal", and four extrinsic factors: (1) whether the terms of the contract

20

were negotiated, rather than boilerplate, and during the negotiations the parties specifically discussed the issue which has become the topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's-length transaction; and (4) the parties were knowledgeable in business matters. 268 S.W.3d at 60; *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of America,* 341 S.W.3d 323, 337 n.8 (Tex. 2011) (holding that if a clear and unequivocal disclaimer-of-reliance clause exists the analysis then proceeds to the circumstances surrounding the contract's formation).

This Court has determined that the four extrinsic factors that the *Forest Oil* court described are not absolute requirements. *Allen*, 367 S.W.3d at 384. And the Court has previously held that an agreement between two parties barred fraud claims as a matter of law even when all of the *Forest Oil* factors were not present. *See Atlantic Lloyds Ins. Co. v. Butler,* 137 S.W.3d 199, 216-17 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (disclaimer of reliance provision barred fraudulent inducement claim when all factors later identified in *Forest Oil* were satisfied except sophistication of parties); *see also McLernon v. Dynegy, Inc.,* 347 S.W.3d 315, 333 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (noting that *Forest Oil* considerations are "facts…that guide our reasoning … and not elements that all must be established before a disclaimer of reliance is enforceable."). Thus, it is

21

unnecessary to satisfy each factor when the parties' intent to preclude a claim is clear and unequivocal and a sufficient number of factors are met. 367 S.W.3d at 384.

The courts have identified the underlying reasons why disclaimer-of-reliance provisions such as those found in *Forest Oil* and *Schlumberger* should be enforced. As this Court noted in *Allen,* the law favors granting parties the freedom to contract, knowing that courts will enforce their contract's terms, as well as the ability to contractually resolve disputes between themselves fully and finally. 367 S.W.3d at 378; *Italian Cowboy*, 341 S.W.3d at 332; *Gym-N-I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 912 (Tex. 2007); *Forest Oil,* 268 S.W.3d at 58. This Court in *Allen* mentioned an additional reason why a party should not be permitted to claim fraud when he represented in the parties' contract that he did not rely on a representation:

> After-the-fact protests of misrepresentation are easily lodged, and parties who contractually promise not to rely on extra-contractual statements—more than that, *promised that they have in fact not relied upon such statements*—should be held to their word. Parties should not sign contracts while crossing their fingers behind their backs.

*Allen,* 367 S.W.3d at 378, *citing Forest Oil*, 268 S.W.3d at 60.[3]

_____

3   This Court in *Allen* noted that similar to the concerns expressed in *Forest Oil*, a Delaware court has stated that non-reliance clauses should generally be enforced because a contrary rule would endorse "a lie made by one contracting party in writing—the lie that it was relying only on contractual representations and that no other representations had been made—to enable it to prove that another party lied orally or in writing outside the contract's four corners." *Allen,* 367 S.W.3d at 378 n.20; *Abry Partners V., L.P. v. F and W Acquisition, L.L.C.,* 891 A.2d 1032, 1058 (Del. 2006). This has been described as "a 'double liar' scenario." *Id.* In a double-liar scenario, the plaintiff—who claims to be the victim of a lie—was itself a liar when it promised not to rely on the alleged misrepresentation.

**A. The disclaimer-of-reliance clause signed by Williamson is clear and unequivocal.**

A side-by-side comparison of the language held by the Texas Supreme Court to be clear and unequivocal in *Schlumberger* and *Forest Oil* conclusively illustrates that the disclaimer-of-reliance clause in this case is clear and unequivocal and meets the threshold requirement for enforcement. In fact, the clause in this case, although strikingly similar to the provisions discussed in *Schlumberger* and *Forest Oil*, is actually more clear and unequivocal than the language discussed and approved in those cases.

The provisions in *Schlumberger*, *Forest Oil*, and in this case are reproduced below for the Court's convenience:

23

| *Schlumberger* | *Forest Oil* | *Williamson's agreed-to disclaimer-of-reliance language* |
|---|---|---|
| **Each of us expressly warrants and represents … that no promise or agreement which is not herein expressed has been made to him or her in executing this release, and that none of us is relying upon any statement or representation of any agent of the parties being released hereby. Each of us is relying on his or her own judgment….** | **[We] expressly represent and warrant … that no promise or agreement which is not herein expressed has been made to them in executing the releases contained in this Agreement, and that they are not relying upon any statement or representation of any of the parties being released hereby. [We] are relying upon [our] own judgment….** | **Grantee has accepted this deed and purchased the above-described Property, premises and improvements "AS IS." Grantor and Grantee agree that Grantee is taking the Property "AS IS" with any and all latent and patent defects, and that there is no warranty from Grantor that the Property is fit for a particular purpose. Grantee acknowledges that Grantee is not relying upon any representations, statements, assertions or non-assertions by the Grantor with respect to the Property condition, but is relying *solely* upon Grantee's examination of the Property.** |

As shown above, the disclaimer-of-reliance language that Williamson agreed to closely tracks the language the *Schlumberger* and *Forest Oil* disclaimers. If anything, the language is stronger than in *Schlumberger* and *Forest Oil,* as the disclaimer explicitly states that Williamson was relying *solely* on her own

examination.[4] The language is not a mere "as is" clause. Instead, as the Court concluded in *Schlumberger* and *Forest Oil*, the language makes clear that Williamson "unequivocally disclaimed reliance" by signing the agreement.

**B.     The language was not boilerplate and the parties discussed the issue.**

In addition to being clear and unequivocal, the extrinsic factors mentioned by *Forest Oil* support the enforcement of the disclaimer-of-reliance language.

The terms of the contract between Williamson and the Pogues were negotiated rather than boilerplate. The terms of the earnest money contract were negotiated, initially by Williamson's then-boyfriend Lewis Walker—who made the first offer to purchase the Pogues' property. 6A RR 38, 10 RR PX 2E. The Pogues had originally listed the Indian Shores property for $269,000. 6A RR 36. Walker's first offer was for $208,000, with the Pogues owner-financing $187,200. 6A RR 55. The Pogues rejected this offer. Shortly thereafter, Williamson contacted Gina Jones, who was the listing agent and who Williamson testified represented her as well in the transaction. 6A RR 53. Williamson increased Walker's previous offer to $235,000, which the Pogues accepted.  6A RR 36.  Williamson negotiated special terms in which the Pogues would finance $210,000 of the purchase price for two years with a balloon payment for the remaining balance at the end of the two-year period. 10

_____

4    This Court in *Allen* held that language making it clear that a party relied solely on his own investigation made the disclaimer clear and unequivocal. 367 S.W.3d at 379-80.

RR PX 2, 5. These special provisions were put in Paragraph 11 of the earnest money contract that Williamson submitted, along with another provision that the mineral rights would be withheld by the Pogues. 10 RR PX 2, ¶ 11. The parties also agreed to a Seller Financing Addendum. The earnest money contract was later amended by Williamson and the Pogues to include additional real property. 10 RR PX 2, p. 11. Williamson herself acknowledged that she and the Pogues were negotiating an issue in the contract but she couldn't remember precisely what that issue was. 2 RR 199-200.

Not only was the earnest money contract negotiated and not boilerplate, the warranty deed the parties signed and which contained the disclaimer-of-reliance language was also not boilerplate. The deed was prepared by an attorney—Donna Heinlein. This was not a form deed. 10 RR PX 7. It contained the reservation of minerals that was agreed to by Williamson in the earnest money contract, and a waiver of surface rights for future exploration. 10 RR PX 7, p. 2. The deed further included a reference to the wrap note that Williamson agreed to when she requested that the Pogues owner-finance the property. 10 RR PX 7, p. 3.

Importantly, the disclaimer-of-reliance paragraph was inserted in a different and larger type-font than the deed's other provisions. This paragraph included the agreement that Williamson made in the earnest money contract that the Pogues were conveying the property to her "as is". 10 RR PX 7, p. 3. Williamson stated that she

discussed the "as is" language with her realtor who told her it was "standard contracting" but she never discussed the issue with Ms. Heinlein, who Williamson thought was both her and the Pogues' attorney, even though Williamson admitted that she was advised by the terms of the contract to consult an attorney. 6A RR 225, 226, 2 RR 204, 10 RR PX 2, ¶ 23.

The terms of the earnest money contract and deed were negotiated, and not boilerplate, because their terms, including the disclaimer-of-reliance provision, were unique to the relationship between Williamson and the Pogues. *See McLernon v. Dynegy, Inc.,* 347 S.W.3d 315, 330 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Williamson was free to include anything that she wanted in the earnest money contract, and she could have contacted Heinlein, who she believed to be her attorney, to discuss the deed's provisions. *See Hong v. Nations Renovations, LLC*, No. 05-15-01036-CV, 2016 WL 7473900, at *5 (Tex. Civ. App.—Dallas, Dec. 29, 2016, no pet.); *Bever Properties, LLC v. Jerry Huffman Custom Builder, L.L.C.*, No. 05-13-01519-CV, 2015 WL 4600347, at *9-11 (Tex. Civ. App.—Dallas, July 31, 2015, no pet.) (enforcement of disclaimer-of-reliance provision is not barred where parties had access to an attorney but decided not to protect their interests by seeking advice of counsel).

In addition, the parties discussed the issue that has now become the topic of this dispute. The meaning of "the topic of the subsequent dispute" mentioned by

*Forest Oil* does not mean that the parties must have discussed the present fraud or misrepresentation claims.[5] Instead of the allegations and the subsequent lawsuit, the *Forest Oil* analysis of the enforceability of the contract concerns the terms of the contract that the party is seeking to enforce. The significant point with respect to the *Forest Oil* factors is that the party that signed the disclaimer-of-reliance provision was aware of the representations concerning the topic of the present dispute yet elected to disclaim reliance on those representations. *McLernon,* 347 S.W.3d at 331.

Here there is no question that Williamson was aware of the specific representations concerning the topic of the present dispute. She admitted that she received the Pogues' Seller's Disclosure Statement, which the Pogues had completed when they listed the Indian Shores property for sale with Gina Jones. 6A RR 38-89, 6B RR 107. All of Williamson's claims in this suit are based on her allegations regarding the Pogues' representations contained in the disclosure. Williamson claimed in her pleadings that in their disclosure, the Pogues failed to disclose prior water damage, mold damage, and structural roof damage to the property. III First Supp. CR 831, Pars. 12-19. At trial, Williamson asserted that although the Pogues never represented the condition of the property to her, she

---

5   As the courts have held, if the contracting parties had discussed the fraud claims and the complaining party was aware of the material misrepresentations before signing the agreement, there would be no such fraud claim because they would not have been deceived into signing the agreement. *See McLernon v. Dynegy, Inc.,* 347 S.W.3d 315, 331 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

considered the seller's disclosure a representation about the property. 6B RR 44, 114-15. Despite having received the disclosure and the representations the Pogues made therein, Williamson elected to disclaim reliance on those representations. Because Williamson was aware of the specific representations that she later made the basis of her suit, the *Forest Oil* factor requiring the parties to have discussed the matters disclaimed was met.

### C. Williamson was represented by counsel in the transaction.

The next factor *Forest Oil* considered was whether the complaining party was represented by counsel. *Forest Oil,* 268 S.W.3d at 60. Here, the evidence is that Donna Heinlein was the attorney that closed the transaction and prepared all of the closing documents. 6A RR 66. Whether or not Heinlein actually represented the parties in connection with the closing, Williamson *believed* that she represented her. Williamson testified on two separate occasions that she assumed and thought that Heinlein was representing both her and the Pogues in connection with the contract. 2 RR 204, 6B RR 104. Williamson testified she believed Heinlein was her attorney as well as the Pogues because both parties paid a portion of the attorney's fees owing to Heinlein's law firm, as shown by the settlement statement, where Williamson is shown paying $600 in attorney's fees to Heinlein. 10 RR PX 4, ln. 1303, 6B RR 106.

Williamson was familiar with using attorneys for real estate matters, as she testified that she had an attorney representing her when she sold her Reidland

property, which she owned before buying the Indian Shores property. 6B RR 104. Williamson admitted that she was sure she could have asked Heinlein a question about the draft closing documents that the attorney sent to her, but Williamson never did. 6B RR 106. Instead, Williamson asked Gina Jones, the realtor, about the "as is" clause, and relied on her and the Seller's Disclosure before signing the documents, even though the record shows that Williamson and Heinlein communicated on a regular basis before and after the closing. 6B RR 105-06, 2 RR 203, 243, 252, 273, 275, and 277-78.

Thus, Williamson was either represented by an attorney in this transaction or had access to an attorney who she thought represented her.

### D. Williamson and the Pogues dealt in an arm's length transaction and Williamson was knowledgeable about business matters.

The final two factors mentioned by *Forest Oil* are that the parties dealt with each other in an arm's length transaction and the parties were knowledgeable in business matters. *Forest Oil,* 268 S.W.3d at 60.

There is no dispute that Williamson and the Pogues dealt with each other in an arm's length transaction. The Pogues listed the property for sale with a realtor and Williamson made an offer through her realtor. 10 RR PX 2, 6A RR 30. The purchase price that Williamson offered was less than the Pogues' asking price, and the terms were negotiated, since instead of a cash deal, Williamson asked the Pogues to owner-finance for twenty-four months with a balloon payment due at the end of

the two-year term. 10 RR PX 2. In addition, the contract included a financing addendum, and the contract was amended twice, once in order to modify the real property description and again to change the closing date. 10 RR PX 2, pp. 9, 11-12. Williamson was advised in the earnest money contract that she should consult an attorney before signing the agreement if she did not understand its effect. 10 RR PX 2, ¶ 23. There was no prior relationship between Williamson and the Pogues, although she had met Mr. Pogue when Williamson was younger and worked in the local feed store where Mr. Pogue purchased feed. 2 RR 259, 6B RR 42-43.

As to whether the parties were knowledgeable in business matters, it appears that while both parties were fairly unsophisticated, Williamson was knowledgeable in business matters generally. She testified that she had worked in the retail industry most of her life and, at the time of trial she worked at a marine and boat repair company where she had been the office manager for ten years. 2 RR 184-86. In her job as office manager, she testified that she handled "pretty much anything that comes through the office", including invoicing, ordering, estimating, handling the phones, and filing paperwork. 2 RR 187, 6A RR 26-27.

In connection with the property, Williamson contacted the realtor and worked with her to put together a non-standard offer to purchase the Indian Shores property at a reduced price, and with a wrap-note and a two-year balloon payment. After the contract was signed, Williamson reviewed the Seller's Disclosure and the closing

documents, and asked the realtor about the "as is" language, and had numerous communications with the attorney about the closing documents. 6B RR 105-06, 2 RR 203, 243, 252, 273, 275, and 277-78. Williamson knew that she had to obtain insurance on the property, and she researched and located an insurance company that would insure the property, found out about a previous "wind claim", and after reviewing the closing documents, signed all of them.

Thus, Williamson was knowledgeable in business matters and this *Forest Oil* factor does not prevent the enforcement of the disclaimer-of-reliance language that Williamson agreed to.

In sum, the disclaimer-of-reliance language was clear and unequivocal and is in fact more clear and certain than similar language approved by the Texas Supreme Court. In addition, the remaining *Forest Oil* factors support the enforcement of the disclaimer-of-reliance language.

### E. Because of the disclaimer-of-reliance language, Williamson cannot recover under any of her tort theories as a matter of law.

The question whether disclaimer-of-reliance language negates a cause of action is a question of law that is reviewed *de novo. Forest Oil,* 268 S.W.3d at 55. The jury charge submitted questions related to the following causes of action: common law and statutory fraud, negligent misrepresentation, and Texas Deceptive Trade Practices Act (false, misleading, or deceptive act or practice and unconscionable action). Tab A, III First Supp. CR 869. The jury answered the

questions favorable to Williamson and the court awarded damages under the DTPA. Tab B, III First Supp. CR 902.

Reliance is an element of Williamson's causes of action for fraud, negligent misrepresentation, as well as the DTPA claim. *See Henry Schein, Inc. v. Stromboe,* 102 S.W.3d 675, 693 (Tex. 2002); *Williams v. Dardenne,* 345 S.W.3d 118, 124 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Larsen v. Carlene Langford & Assocs., Inc.,* 41 S.W.3d 245, 253 (Tex. App.—Waco 2001, pet. denied). Specifically, the Court has held that under the DTPA—which only requires a producing cause of damages—a contractual disavowal of reliance on representations precludes a plaintiff from proving that an act was a producing cause of the damages. *Prudential Ins. Co. of America v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995).

Here, Williamson, as a matter of law, cannot recover for any of the damages found by the jury for fraud, negligent misrepresentation, or DTPA violations because of the disclaimer-of-reliance provision. This Court should therefore reverse the judgment of the trial court and render judgment that Williamson take nothing for any of the damages found by the jury on these causes of action.

**II.  The trial court's judgment extinguishing the Pogues' deed of trust lien is a misapplication of Texas law and constitutes reversible error. (Issue No. 3)**

As stated above, Williamson's obligation to buy the property from the Pogues was secured by a deed of trust lien. 10 RR PX 6. The deed of trust granted the Pogues

a non-judicial power of sale, allowing the Pogues to foreclose their lien without first obtaining a court's permission. 10 RR PX 6, pg. 3. According to current Texas law, the Pogues retained the right to exercise their non-judicial power of sale for a period of four years after the accrual of a cause of action—in this case, nonpayment of the debt by Williamson. TEX. CIV. PRAC. & REM. CODE § 16.035(b). On July 15, 2013, less than a year after Williamson's default (which occurred on September 25, 2012) and well-within the limitations period, the Pogues posted the property for foreclosure in accordance with the terms of the deed of trust. I CR 53.

A few weeks later, the court issued an "Amended Agreed Temporary Injunction Order" which directed the Pogues to refrain from "taking any actions that would initiate, continue or complete a process of foreclosure…until such time as all issues in this matter have been fully litigated or resolved." Second Supp. CR 3. This temporary injunction became a permanent one when the trial court signed its final judgment on July 28, 2017:

> [A] Permanent Mandatory Injunction is hereby issued against Defendants Leslie R. Pogue and Jeannette I. Pogue, and their agents, servants, representatives, employees, independent contractors, officers, directors, partners, successors and assigns, who are permanently ENJOINED from and ORDERED to refrain from foreclosing upon the secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532, contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15 2010, as that lien has been extinguished or released."

I CR 75.

The court's order rests on the premise that because the Pogues waived their counterclaims—including the breach of contract claim made in response to Williamson's failure to make all her payments under the note—and because four years had passed since the default when the final judgment was signed, not only has the Pogues' lien been extinguished, but the underlying debt has been extinguished, as well. 7 RR 71-76. This was error. Under Texas law the Pogues' non-judicial power of sale survives their waiver of judicial remedies and the statute of limitations that governs the period during which they have the right to exercise that power of sale is tolled by the pendency of these very legal proceedings.

## A. Williamson's debt to the Pogues has not been extinguished and currently exists.

There is no question that the Pogues waived their counterclaims before trial got underway. 3 RR 13-15. But there can also be no question that the Pogues' *non-judicial* power of sale contained in the deed of trust—a power they exercised within the applicable limitations period and are currently enjoined from pursuing—survives their decision to waive their right to pursue *judicial* remedies.

It is a fundamental principle of Texas property law that liens can be foreclosed through two different processes: (a) a suit for the recovery of real property brought in a Texas court; or (b) a sale of real property under a power of sale in a mortgage or deed of trust that creates a real property lien. TEX. CIV. PRAC. & REM. CODE §

35

16.035(a-b). It is no accident that these two remedies are given separate treatment in the statute's text despite being governed by the same limitations period—they often have little or nothing to do with one another.

This was the issue facing the Supreme Court of Texas in *Goldfrank, Frank & Co. v. Young*, 64 Tex. 432 (1885). In *Goldfrank*, the Supreme Court made one thing abundantly clear: there is a distinction between "actions or suits" and other mechanisms by which a creditor may enforce a debt:

> In reference to the operation of the statutes of limitation in any matter in which the recovery of money is sought, the statute itself limits it to "actions or suits in courts", and it provides within what time "actions or suits" in the different classes of cases may be brought, but it does not attempt to determine within what period anyone must enforce a right which the debtor has placed in … the creditor to enforce otherwise than by an "action or suit in court."

> That the legislature might fix a period within which steps must be taken to enforce rights otherwise than through the courts, when such right and power have been given, by contract, by one person to another, as may it prescribe a period within which actions or suits must be brought in courts, there is no doubt; but the declaration that persons must institute "suits or actions in courts" within a fixed period to enforce their claims, which can be enforced only in that manner, is not equivalent to declaring that a creditor who has been given, by contract, a right and means by which he may enforce his claim otherwise than through the courts, shall not enforce it after the time at which he might institute an action or suit, without subjecting himself to the bar which could be urged by a plea of limitation.

> It is not always true that rights which cannot be enforced through the courts are valueless, nor that contracts which the courts cannot enforce are invalid."

*Id*. at 436.

36

*Goldfrank* is still good law. *See Holman Street Baptist Church v. Jefferson*, 317 S.W.3d 540, 547 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (citing *Goldfrank* for the proposition that a bar from collecting a debt personally from the debtor does not prevent a lender from using the collateral to repay the debt).

Because the Pogues' deed of trust contains a provision that expressly allows them to enforce their claim "otherwise than through the courts"—that is, through the exercise of a non-judicial power of sale—as *Goldfrank* makes clear, the fact that the Pogues' judicial enforcement of Williamson's debt is no longer possible has no bearing on the exercise of their non-judicial power of sale. Thus, the trial court's declaration that the deed of trust lien is extinguished and released constitutes reversible error. The Williamson debt still exists, as does the Pogues' right to foreclose on the property.

**B.     The Pogues' right to foreclose is not barred by the applicable statute of limitations.**

In Texas, a sale of real property under a power of sale in a mortgage or deed of trust that creates a real property lien—precisely the debt-enforcement tool acquired by the Pogues—must be made not later than four years after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE § 16.035(b). The Pogues' cause of action accrued on September 25, 2012 when Williamson's balloon payment was due. 7 RR 74, lns. 9-11, 10 RR PX 5. Less than a year later, effective July 22, 2013, the Pogues were enjoined by the trial court from pursuing their non-judicial

37

remedies. Second Supp. CR 3, ¶ 6. This temporary injunction became permanent when the trial court issued its final judgment on July 28, 2017. III First Supp. CR 902. As a result of these injunctions, the Pogues have been unable to exercise their right to conduct a non-judicial foreclosure sale for nearly five years. But because these pending legal proceedings have barred any such sale, the statute of limitations has been, and continues to be, tolled until such time that the Pogues may freely exercise the right afforded them under their deed of trust.

Where "a person is prevented from exercising his legal remedy by the pendency of legal proceedings, the time during which he is thus prevented should not be counted against him in determining whether limitations have barred his right." *Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 157 (Tex. 1991) (quoting *Walker v. Hanes*, 570 S.W.2d 534, 540 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.)). This principle has even been specifically applied to injunctions which, like those issued by the trial court in this case, bar a party from exercising their power of sale: "[i]t appears, however, that the creditor has been continuously restrained from the exercise of such powers of sale since the accrual of the right thereto by an injunction wrongfully procured by the debtors…. [I]t is generally held that where the exercise of a lawful right is restrained by injunction, the statute of limitations is tolled during the period of such restraint on the theory that the party who has obtained the injunction has…obtained an unconscionable advantage which he ought

not be permitted to enjoy." *Pioneer Bldg. & Loan Ass'n v. Johnston*, 117 S.W.2d 556, 559 (Tex. Civ. App.—Waco, 1938, writ dism'd).

As mentioned above, Williamson's debt to the Pogues survives these legal proceedings, no matter what the outcome. And because the Pogues' deed of trust contains a non-judicial power of sale, they still possess a tool by which to enforce that debt, even though their judicial remedies have been waived. Further, because the Pogues have been barred by trial court injunctions from exercising their power of sale, the statute of limitations governing such an exercise has been, and will be, tolled until such time that the injunctions are no longer in effect. Because Pogues' deed of trust affords them a non-judicial remedy for enforcing the Williamson debt, this Court should reverse that portion of the trial court's judgment that prevents the Pogues from exercising this remedy and render judgment allowing the Pogues to go forward with foreclosure proceedings.

## III. The DTPA damages awarded by the trial court were improper. (Issue No. 4).

Even if Williamson had not disclaimed reliance, the trial court erred in entering judgment for the DTPA damages it awarded.

### A. The trial court erred in entering its judgment for additional damages of $327,500 because this award does not conform to the jury's verdict.

In a case tried to a jury, the judgment rendered after the jury's verdict must conform to that verdict. TEX. R. CIV. P. 301; *Phillips v. Phillips,* 820 S.W.2d 785,

39

787 n.2 (Tex. 1991) ("as a rule, however, the judgment in a case tried by a jury must conform to the verdict"). The judgment must also reflect a correct application of the law to determine the effect of the jury's verdict. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex. 1992) ("a trial court has no 'discretion' in determining what the law is or applying the law to the facts"); *Salomon v. Lesay,* 369 S.W.3d 540, 553 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

Here, the trial court awarded damages under the Texas Deceptive Trade Practices Act instead of the fraud or negligent misrepresentation claims submitted to the jury. This fact is clear from the court's judgment which, on page two, recites that the actual damages awarded total $163,750—the amount of actual damages found by the jury in response to Question 15, which is related to the DTPA Questions 12 and 13. Tab A, III First Supp. CR 892.[6]

The DTPA provides that if a jury finds that a party engaged in the conduct in question knowingly, then the trier of fact may award additional damages of up to three times the amount of economic damages. TEX. BUS. & COM. CODE ANN. § 17.50(b)(1).

In a jury trial, it is the jury, and not the judge, that acts as the trier of fact. Only in the absence of a jury is an award of discretionary damages under the DTPA a

---

6   The fraud and negligent misrepresentation damages found by the jury totaled $174,950, not $163,750.  III First Supp. CR 877, 887.

40

question for the court. *Martin v. McKee Realtors,* 663 S.W.2d 446, 448 (Tex. 1984); *Boat Superstore v. Haner*, 877 S.W.2d 376, 379 (Tex. App.—Houston [1st Dist.] 1994, no pet.) ("the amount of additional damages to award after finding a violation of the DTPA is within the discretion of the trier of fact").

In answer to Question 17, the jury found that because the conduct was committed knowingly, additional damages of $2,500 should be awarded to Williamson. III First Supp. CR 896. But the trial court ignored this finding and instead awarded $327,500 in additional damages based on the "knowing" finding. Tab B, III First Supp. CR 903. This was clear error.

The DTPA allows the *factfinder* to award additional damages of not more than three times the amount of actual damages if the conduct is committed knowingly. Here, the jury found $2,500 and it was improper for the trial court to unilaterally ignore the jury's finding and award additional damages of a different amount.

The trial court erred in entering judgment for additional damages of $327,500 and the Court should reverse this portion of the judgment.

**B. The trial court erred in awarding both loss of the benefit-of-the-bargain damages and out-of-pocket damages under the DTPA, as the award constitutes a double recovery.**

The trial court's judgment awarded Williamson $496,250 in damages, exclusive of attorney's fees and prejudgment interest. Tab B, III First Supp. CR 904. This sum was computed by totaling the actual damages of $163,750 and "treble

41

damages" in the amount of $327,500. Tab B, III First Supp. CR 903. The trial court then apparently awarded an additional $5,000 in damages to these amounts for the $496,250 total. [7]

As argued above, it was clear error for the trial court to award the additional damages of $327,500 under the DTPA for "knowing" conduct, because the jury found only $2,500 for this conduct.

But this was not the only error in the trial court's calculation of the damages awarded. The $163,750 in actual damages constitutes a double recovery, as the amount includes both loss of benefit-of-the-bargain damages and out-of-pocket damages found by the jury.

Under § 17.50(a), a DTPA plaintiff may recover "economic damages". TEX. BUS. & COMM. CODE ANN. § 17.50(a). Economic damages consist of either benefit-of-the-bargain damages or out-of-pocket damages. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 817 (Tex. 1997). Out-of-pocket damages measure the difference between the value the buyer has paid and the value of what he has received; benefit-of-the-bargain damages measure the difference as represented and the value received. *Id.* Under the DTPA, a plaintiff may recover

_____

7   It is unclear exactly how the trial court arrived at the total amount of the judgment (exclusive of attorneys' fees and pre-judgment interest) of $496,250. Tab B, III First Supp. CR 904.  If one totals the amount of actual damages awarded of $163,750 and the additional damages of $327,500 awarded as additional damages, these amounts total only $491,250. The court may have awarded another $2,500 against Mr. Pogue and $2,500 against Mrs. Pogue based on the jury's answer to Question 17—for "knowing" conduct.

42

under the damage theory that provides the greater recovery, but these damages are alternatives. A plaintiff may not recover both. *Latham v. Castillo,* 972 S.W.2d 66, 70 (Tex. 1988) ("a plaintiff may recover either the out-of-pocket or the benefit-of-the-bargain damages, whichever is greater"); *Foley v. Parlier,* 68 S.W.3d 870, 885 (Tex. App.—Ft. Worth 2002, no pet.); *Huynh v. Phung,* No. 01-04-00267-CV, 2007 WL 495023 at *7 (Tex. App.—Houston [1st Dist.] Feb. 16, 2007, no pet.).

In answer to Question No. 15 related to the DTPA liability questions, the jury found a total of $163,750 in damages. Tab A, III First Supp. CR 892-93. This total included both loss of benefit-of-the-bargain damages and out-of-pocket damages. Instead of awarding damages under one or the other theories, the court awarded both benefit-of-the-bargain and out-of-pocket damages. This is error, as it constitutes a double recovery, and the court's award of these damages should be reversed.

**C.     The trial court erred in including future benefit-of-the-bargain and out-of-pocket damages in the actual damages awarded under the DTPA.**

In addition, the award of actual damages of $163,750 awarded in the judgment under the DTPA included *future* benefit-of-the-bargain and out-of-pocket damages. Tab A, III First Supp. CR 892, Question 15(2) and (4). This was improper.

As above noted, under the DTPA (as well as Texas common law) the direct damages that the plaintiff may recover for misrepresentations are either out-of-pocket damages or benefit-of-the-bargain damages. Under the DTPA, a plaintiff may

43

recover under the damage theory that provides the greater recovery, but both measures of damages are determined *at the time of sale induced by the fraud. Arthur Andersen,* 945 S.W.2d at 817; *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 373 (Tex. 1984); *Fazio v. Cypress/GR Houston I, L.P.,* 403 S.W.3d 390, 395 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Here, Question 15(2) and (4) allowed the jury to award benefit-of-the-bargain damages and out-of-pocket damages that Williamson would sustain *in the future.* III First Supp. CR 892. The jury's answers included an award of future benefit-of-the-bargain damages of $58,000 and future out-of-pocket damages of $11,800. Both of these amounts were included in the $163,750 awarded by the court.

This Court has consistently held that it is error to award future loss of benefit-of-the-bargain or out-of-pocket damages. *See Woodyard v. Hunt,* 695 S.W.2d 730, 733 (Tex. App.—Houston [1st Dist.] 1985) ("Even if the jury had known the measure of damages, it could not have made a proper award because damages are measured by comparing values represented and received at the time of sale, not at some future time."); *Fazio,* 403 S.W.3d at 396. ("direct damages for fraud, including out-of-pocket damages are properly measured at the time of the sale …not at some future time").

Because the damages found by the jury in answer to Questions 15(2) and (4) are, as a matter of law, an improper measure of damages, the trial court erred in not

disregarding these damage awards and in entering judgment against the Pogues for these amounts.

> **D.      The trial court erred in entering judgment awarding benefit-of-the-bargain damages under the DTPA because there was no evidence of the property's value as it was received by Williamson.**

Questions 15(1) and (2) asked the jury the amount of the loss of the benefit-of-the-bargain damages that should be awarded to Williamson in the past, and in the future. The jury awarded $17,000 for loss of benefit-of-the-bargain damages in the past and $58,000 in loss of benefit-of-the-bargain damages in the future. III First Supp. CR 892. The jury was instructed that the loss of the benefit-of-the-bargain was "the difference, if any, in the value of the Property as it was received, and the value it would have had if it had been as represented. The difference in value, if any, shall be determined at the time and place the Property was sold to Liz Williamson." *Id.*

While there was evidence of the purchase price or value given by Williamson—the purchase price she agreed to pay was $235,000—Williamson provided no evidence of the value of the Indian Shores property as it was received by her in September 2010 when she purchased it. In other words, there was no evidence that the property was valued at $17,000 less (in the past) or would be valued $58,000 less (in the future) than the purchase price of $235,000.

The only evidence regarding the value of the property was a Harris County Appraisal District statement showing a value of $123,000 as of January 1, *2013.* 6

45

RR 183, 10 RR PX 14. But this HCAD value constitutes no evidence of the value of the property as Williamson received it in 2010, when she purchased the property. *See McGinty v. Hennen,* 372 S.W.3d 625, 628 (Tex. 2012) (holding that testimony as to the value of a home at the time of trial was no evidence of the difference in value at the time of closing).

In addition, evidence of an appraisal district value is no evidence of property value in any event. Tax assessment values placed upon real property are no evidence of the property's value for any purposes other than taxation. *See Houston Lighting & Power Co. v. Fisher,* 559 S.W.2d 682, 686 (Tex. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.); *Houston v. Ludwick,* No. 14-09-00600-CV, 2010 WL 4132215 at *8 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Because there was no testimony as to the value of the property as it was received in 2010, there is no evidence to support the jury's answers to Questions 15(1) and (2) regarding the benefit-of-the-bargain damages.

### E. The trial court erred in entering judgment for future out-of-pocket damages, future expenses, and future lost time damages.

In answer to Questions 15(4), (6) and (8) the jury awarded a total of $88,750, over one-half of the $163,750 in actual damages the judgment awarded under the DTPA. III First Supp. CR 892-93, 903. There is no evidence to support the jury's answers to these questions.

It is well-established that the plaintiff has the burden of proving with some degree of certainty a factual basis to support the amount of damages awarded. *Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.,* 814 S.W.2d 553, 556 (Tex. App.—Houston [1st Dist.] 1991, no writ). And the damages awarded must be based on some competent evidence and not on mere conjecture. *Id.*; *McIver v. Gloria,* 140 Tex. 566, 169 S.W.2d 710, 712 (1943). In other words, the recovery of damages cannot be based on pure speculation. *Lakewood Pipe,* 814 S.W.2d at 556, *Roth v. Law,* 579 S.W.2d 949, 956 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.).

There is no evidence to support the jury's damage awards under Questions 15(4), (6), or (8). Williamson testified regarding the cost of repairs and renovations she made to the home for the two years she owned it before she filed suit, but when she was asked by her attorney about future "things [that] still need to be done on the home" Williamson's response was simply that "we still don't have a master bathroom, and the kitchen, the dining room and the living room walls haven't been touched". 6A RR 177. There is no evidence whatsoever of the amount of time, expenses, or out-of-pocket costs that will be necessary in the future. More specifically, there is no testimony as to the future costs to replace the "things" that Williamson claims to still be necessary. In sum, there is simply no evidence to support the future damages found by the jury in response to Question 15 and the

47

court erred in failing to disregard the answers to these damage findings, and erred in entering judgment for these amounts.

**IV. The trial court's judgment cannot be supported by the jury's answers to the damages questions related to fraud and negligent misrepresentation—jury Question Nos. 4 and 11. (Issue No. 5)**

Although the trial court's judgment awarded damages under the DTPA theory and not for fraud or negligent misrepresentation, in the event that Williamson attempts to rely on the damages found by the jury under these alternative theories, such reliance would be misplaced. First, no award would be proper under these theories because of the disclaimer-of-reliance provision. Second, no evidence supports these damage awards.

**A. There is no evidence to support the benefit-of-the-bargain damages awarded for fraud and negligent misrepresentation.**

In Question 4(1) the jury awarded $40,000 for loss of the benefit-of-the-bargain damages that Williamson sustained in the past. III First Supp. CR 877. The jury was instructed that the loss of the benefit-of-the-bargain meant the difference, if any, between the value of the property agreed to between Williamson and the Pogues, and the value of the property as is. *Id.*

There is no evidence to support the $40,000 awarded for loss of the benefit-of-the-bargain because Williamson presented no evidence of the value of the Indian Shores property on the date she purchased it, i.e., the value of the property the Pogues sold as is.

48

There was evidence of one element of the benefit-of-the-bargain measure—the purchase price of the property was $235,000—but there was no evidence of the value of the property sold by the Pogues as it was when Williamson purchased it, and specifically, no evidence that the Indian Shores property was valued at $40,000 less than the purchase price on the date Williamson bought it.

As noted above, the HCAD appraisal district statement reflected a value of $123,000 as of January 1, 2013, but this was no evidence of the property's value in 2010, when Williamson purchased it. 6A RR 183, 10 RR PX 14, *see McGinty,* 372 S.W.3d at 628.

In addition, and as argued above regarding the DTPA damages, an appraisal district value is no evidence of property value, as tax assessment values are no evidence of the property's value for any purpose other than tax purposes. *See Houston Lighting & Power Co.,* 559 S.W.2d at 686; *Ludwick,* 2010 WL 4132215, at *8.

A similar question was answered by the jury in response to Question No. 11 related to negligent misrepresentation damages. In the first sub-part of Question 11, the jury awarded $40,000 in negligent misrepresentation damages, being the difference between the value of what Liz Williamson received in the transaction and the purchase price or value given. III First Supp. CR 887. For the same reasons that the DTPA and fraud damages for loss of benefit-of-the-bargain have no support in

the evidence, the jury's answer to this negligent misrepresentation question also has no support in the evidence because there is no evidence of what Williamson received in the transaction and therefore no evidence of the difference between that value and the purchase price.

**B.** **There is no evidence to support the jury's award of future fraud and negligent misrepresentation damages.**

Under Question 4(2) (fraud), the jury awarded Williamson $50,000 in future benefit-of-the-bargain damages. III First Supp. CR 877.

As argued above in connection with the future loss of benefit-of-the-bargain damages awarded under the DTPA, these damages are determined at the time of the sale that was allegedly induced by the fraud, not at some future time. *Arthur Andersen,* 945 S.W.2d at 817; *Leyendecker & Associates,* 683 S.W.2d at 373; *Fazio,* 403 S.W.3d at 395. As noted above, this Court has held that it was error to award future loss of benefit-of-the-bargain damages. *See Woodyard,* 695 S.W.2d at 733; *Fazio,* 403 S.W.3d at 396.

In addition, there is no evidence to support the jury's answer to Questions 4(4), and 4(6). In Question 4(4), the jury awarded Williamson $4,000 in future remedial damages and in Question 4(6) the jury awarded $4,000 in future mitigation expenses. Similarly, in answer to the third subpart of Question 11 (negligent misrepresentation) the jury awarded Williamson $58,000 in future economic losses. III First Supp. CR 877-78, 887.

50

For the same reasons that there is no evidence to support the future DTPA damages awarded by the jury, there is no evidence to support the future damages awarded by the jury for fraud and negligent misrepresentation.

Williamson did not even attempt to provide any evidence for the jury to determine any future damages. Williamson testified regarding the repairs she had completed, but she provided no testimony upon which the jury could award any amounts for future damages. When asked about the future repairs that would be needed, Williamson testified in general terms that "we still don't have a master bathroom, and the kitchen, the dining room and the living room walls haven't been touched". 6A RR 177. Williamson provided no evidence as to the materials and labor that would be necessary in order to complete any future repairs. Also, there was no testimony regarding the property's value after Williamson completed the repairs and renovations. Thus, there is no evidence of future damages based on the sale of the property at some future time.

Because there is no evidence of future damages, they cannot support a judgment. *See Lakewood Pipe,* 814 S.W.2d at 556. The damages awarded by the jury were based on conjecture and speculation, and not on competent evidence and are therefore improper. *Id., McIver,* 169 S.W.2d at 712.

Because the record contains legally insufficient evidence to support the future damages awarded by the jury in Questions 4(2), (4), (6) and the third sub-part of

Question 11, they cannot support a judgment against the Pogues. The trial court therefore erred in failing to disregard the jury's answers to these questions and this Court should render a take-nothing judgment in the Pogues' favor on the damages found under these issues.

> **C.     There is no evidence to support the jury's award of past remedial damages, mitigation expenses, and economic loss.**

In Question 4(3) the jury awarded $39,000 to Williamson for past remedial damages, which the charge defined as the reasonable and necessary costs to repair the property. III First Supp. CR 877. In answer to Question 4(5), the jury awarded $37,950 in past mitigation expenses, defined as the reasonable and necessary expenses in attempting to have the property repaired. III First Supp. CR 878. There is no competent evidence to support these damage awards of past costs to repair or attempt to have the property repaired.

No construction expert testified regarding the renovations Williamson made to the property. Williamson herself testified, describing the problems she detected after they moved in. 6A RR 111-176. Of course, all of these repairs were conducted over the two-year period after Williamson purchased the property, and the repairs were completed before she ever notified the Pogues about any problems. 3 RR 155, 6B RR 92-93.

In general terms, Williamson testified about the rooms that were painted, the insulation and sheetrock that was replaced in the affected rooms, the damage to a

52

portion of the roof, and the repairs to one of the septic tanks. Williamson admitted that some of the renovations were done not because they were necessary to repair damage, but because they wanted to change items such as the flooring in part of the house, and the fireplace, which they remodeled. 6A RR 123, 155.

Williamson also admitted that she and her husband were not construction or repair professionals. 6A RR 156. But expert testimony of repair costs is required in order to recover these damages, and the lay testimony of Williamson therefore does not support the jury's verdict. As a general rule, matters involving specialized or technical knowledge require expert testimony. *See FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 90-91 (Tex. 2004). And Texas courts have held that evidence pertaining to the necessity and reasonableness of repair costs falls within the exclusive domain of an expert. *Pjetrovic v. Home Depot,* 411 S.W.3d 639, 649 (Tex. App.—Texarkana 2013, no pet.); *Wortham Bros., Inc. v. Haffner,* 347 S.W.3d 356, 360 (Tex. App.—Eastland 2011, no pet.).

Here, the repairs were of a technical and specialized nature, and required expert testimony. Williamson testified at length regarding purported mold damage that she remediated, wood rot that she diagnosed and repaired, the necessity for insulation to be replaced and sheetrock to be removed and repaired, and repair or replacement of certain exterior walls and ceiling repair in several rooms. 6A RR 111-176.

Not only did no expert testify regarding the cost of repairs as being reasonable and necessary, the "proof" that Williamson offered was not competent evidence. Williamson testified that she and her husband were charging for personal labor costs for the repairs. 6A RR 155, 10B RR, PX 35Q — "Assessment of Personal Labor Charges at 901 Indian Shores". In Exhibit 35Q, Williamson purported to itemize room-by-room labor charges that she and her husband claimed. When asked where she came up with the hourly rate for the personal labor charges, Williamson testified that she got it from an internet website, Homewise.com, which supposedly listed prices for contractors in her area. 6A RR 155-56. Williamson testified she used one-third of the contractor's amount because she and her husband were "not professionals" and she "thought that would be fair". 6A RR 156.

The total amount of Williamson's estimated "labor costs" was $37,950, the amount the jury awarded under Question 4(5) as past mitigation expenses. 6A RR 168, III First Supp. CR 878. But because the amounts of labor costs are simply Williamson's estimate of a discounted labor rate based on a website, there is no competent evidence of the labor costs, even if expert testimony was not required.

Williamson's testimony regarding the items purchased to repair the property was also not competent. Williamson summarized the list of items that were used to

repair the home. 6A RR 168-175; 10B RR PX 35R. The total of the items Williamson claimed they purchased was $43,724.45. 6A CR 176.[8]

As above indicated, there was no testimony from anyone other than Williamson that the items she purchased for repair were reasonable and necessary in order to repair the home. And because there was no competent evidence, the jury's answer to Questions 4(3) (remedial damages) and (5) (mitigation expenses) should have been disregarded by the court and cannot support a judgment in favor of Williamson.

The jury, in answer to question number 11, also awarded damages to Williamson for economic losses suffered in the past. III First Supp. CR 887. These damages—$76,950—cannot support any judgment because there is no evidence to support the jury's findings.

The damages recoverable for negligent misrepresentation include the pecuniary loss suffered as a consequence of the plaintiff's reliance upon the misrepresentation. *Federal Land Bank Ass'n of Tyler v. Sloane,* 825 S.W.2d 439, 442-43 (Tex. 1991); RESTATEMENT (2ND) OF TORTS § 552B (1977).

---

8   It appears from the extensive list of the items that Williamson purchased that she gutted and renovated the entire house before she ever told the Pogues about any problems. Light fixtures, electrical wall receptacles, showers, tubs, sinks, and mirrors were listed among the items purchased and replaced. Incredibly, Williamson even charged $2,300 for a new stove-top and $2,400 for air-conditioning repair, which she admitted would have been covered under the home warranty that the Pogues paid for but that she didn't use. 6A RR 175. She also charged $3,500 to replace the carpet, which she knew from her first visit was stained and dirty. 6B RR 35.

Here there is no competent evidence to support the amount found by the jury for past economic loss. In answer to the second subpart of Question Number 11, the jury awarded $76,950 for past economic loss based on the misrepresentations. III First Supp. CR 887. This total is the same as the total of the past remedial damages and past mitigation expenses found by the jury under the fraud questions. III First Supp. CR 877-78.

For the same reasons that the past remedial damages and mitigation expenses have no support in the evidence, there is no competent evidence to support the jury's answer to the second subpart of Question 11.

As above argued, Williamson and her husband made the repairs themselves. Williamson admitted that they were not professional contractors and Texas law is clear that homeowner's testimony about repair costs is not competent evidence. Moreover, as above explained, even if Williamson was competent to testify about the reasonableness and necessity of the repairs, the jury's award for economic loss for negligent misrepresentation is based on conjecture and speculation. Williamson testified that she and her husband charged for labor expense based on an internet website and that she charged what she "thought would be fair" based on her opinion of how much that contractor rate should be discounted. 6A RR 156.

Finally, as above explained, Williamson's testimony regarding the items purchased to repair the property constitutes no competent evidence of the economic

loss suffered. No expert testified that the items purchased were reasonable and necessary in order to repair the home. And because there was no competent evidence, the jury's answer to the second subpart of Question 11 regarding the past economic loss should have been disregarded by the court and cannot support a judgment in Williamson's favor.

**V.  Because the trial court erred in entering judgment against the Pogues, the court's award of attorney's fees should be reversed. (Issue No. 6)**

In addition to awarding $576,547.44 in actual damages and pre-judgment interest, the court awarded Williamson trial attorney's fees of $171,972.23 and additional $12,250 in contingent appellate attorney's fees, for a total attorney's fee award of $184,222.23. III First Supp. CR 904.

The DTPA allows a prevailing party to recover reasonable and necessary attorney's fees. TEX. BUS. & COM. CODE ANN. § 17.50(d). But because Williamson is not entitled to recover any damages under the DTPA, she is not entitled to recover any attorney's fees, and the award should be reversed. *Gulf States Utilities Co. v. Low,* 79 S.W.3d 561, 567 (Tex. 2002).

Moreover, although the damages were not awarded for statutory fraud, in the event that Williamson would seek to rely on the jury's finding of statutory fraud (Jury Question No. 2) this finding would not support any award of attorney's fees.

TEX. BUS. & COM. CODE ANN. § 27.01(d)—the statutory fraud statute— provides that attorney's fees are available to the prevailing party. But as with the

57

DTPA, if the party is not entitled to recover on the statutory fraud claim, the party cannot recover attorney's fees. *Jerry L. Starkey, TBDL, L.P. v. Graves,* 448 S.W.3d 88, 112 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Because Williamson is not entitled to recover a judgment against the Pogues for any amount, the court should reverse the judgment awarding attorney's fees.

## Prayer for Relief

The judgment should be reversed and judgment rendered that Williamson take nothing against the Pogues and that the deed of trust is enforceable against the property securing Williamson's note. In the alternative, the judgment should be reversed and the case remanded for a new trial.

Respectfully submitted,

**DE LANGE, HUDSPETH, MCCONNELL
& TIBBETS, L.L.P.**

By: /s/ Ben A. Baring, Jr.
    BEN A. BARING, JR.
    State Bar No. 01739050
    bbaring@dhmtlaw.com
    R. Travis Piper
    State Bar No. 24070421
    tpiper@dhmtlaw.com
    1177 West Loop South, Suite 1700
    Houston, TX 77027
    Phone: 713-871-2000
    Fax: 713-871-2020

ATTORNEYS FOR APPELLANTS,
LESLIE R. POGUE AND JEANNETTE I. POGUE

## Certificate of Service

I certify that on May 25, 2018, a true and correct copy of Appellants' Brief has been served on counsel for Appellee by electronic service pursuant to Rule 9.5 of Texas Rules of Appellate Procedure:

Misty Hataway-Coné
Spurlock & Associates
17280 West Lake Houston Pkwy.
Humble, TX 77346
email: MCone@spurlocklaw.com
*Attorneys for Appellee*

/s/ Ben A. Baring, Jr.
BEN A. BARING, JR.


## Certificate of Compliance

I certify that this brief contains 13,915 words (excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Ben A. Baring, Jr.
BEN A. BARING, JR.

No. 1-17-00844-CV

IN THE COURT OF APPEALS
FOR THE FIRST DISTRICT OF TEXAS

LESLIE R. POGUE AND JEANNETTE I. POGUE, *Appellants*

VS.

ELIZABETH A. WILLIAMSON, *Appellee.*

*(On Appeal from the 164th Judicial District Court of
Harris County, Texas, Trial Court Cause No. 2012-56353)*

APPENDIX TO APPELLANTS' BRIEF

Tab A—Jury Charge.

Tab B—Final Judgment.

# Tab A



CAUSE NO. 2012-56353

| ELIZABETH A. WILLIAMSON | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| LESLIE R. POGUE and | § | |
| JEANETTE I. POGUE | § | 164TH JUDICIAL DISTRICT |

FILED
Chris Daniel
District Clerk
MAY 12 2017
Time
Harris County, Texas
By
Deputy

---

## CHARGE OF THE COURT

---

**MEMBERS OF THE JURY:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are note deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

        1.      Do not let bias, prejudice, or sympathy play any part in your decision.

1

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

869

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3. You are to make up your own mind about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any questions or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say "I will answer this question your way if you answer another question my way."

11. The answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

2

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

871

# DEFINITIONS AND INSTRUCTIONS

## Definitions:

"Liz Williamson" means Plaintiff, Elizabeth A. Williamson.

"Defendants" means Defendants Leslie R. Pogue and Jeannette I. Pogue.

"Leslie Pogue" means Defendant Leslie R. Pogue.

"Jeannette Pogue" means Defendant Jeannette Pogue.

The "Property" means that certain property in Harris County described as 901 Indian Shores Road, Harris County, Crosby, Texas 77532.

## Instructions:

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

# QUESTION NO. 1

Did any of those named below commit fraud against Liz Williamson?

Fraud occurs when—

1.  A party fails to disclose a material fact within the knowledge of that party; and

2.  The party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; and

3.  The party intends to induce the other party to take some action by failing to disclose the fact, and

4.  The other party suffers injury as a result of acting without knowledge of the undisclosed fact.

Answer "Yes" or "No."

A.  Leslie Pogue

Answer: YES

B.  Jeannette Pogue

Answer: YES

## QUESTION NO. 2

Did any of those named below commit statutory fraud against Liz Williamson?

Fraud occurs when—

1.      There is a false representation of a past or existing material fact, and

2.      The false representation is made to a person for the purpose of inducing that person to enter into a contract, and

3.      The false representation is relied on by that person in entering into that contract.

Answer "Yes" or "No."

A.      Leslie Pogue

Answer: __YES__

B.      Jeannette Pogue

Answer: __YES__

874

If you answered "Yes" to Question Nos. 1 or 2 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages only to those you found caused or contributed to cause the harm. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one named below is not necessarily measured by the number of acts or omissions found.

## QUESTION NO. 3

For each person you found caused or contributed to cause the harm to Liz Williamson, find the percentage of responsibility attributable to each:

1. Leslie Pogue      __50__ %

2. Jeannette Pogue      __50__ %

     Total      __100__ %

7

If you answered "Yes" to Question Nos. 1 or 2 then answer the following question. Otherwise, do not answer the following question.

876

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Liz Williamson for her harm, if any, that were proximately caused by such fraud?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other.

A. **Loss of the benefit of the bargain**—The difference, if any, between the value of the Property agreed to between Liz Williamson and the Defendants, and the value of the Property sold as is.

B. **Remedial damages**—The reasonable and necessary costs to repair the Property.

C. **Mitigation expenses**—The reasonable and necessary expenses incurred in attempting to have the Property repaired.

D. **Incidental damages**—The reasonable and necessary expenses incurred while the Property was being repaired.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1. Loss of the benefit of the bargain damages Liz Williamson sustained in the past.

Answer: $ 40,000

2. Loss of the benefit of the bargain damages Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 50,000

3. Remedial damages Liz Williamson sustained in the past.

Answer: $ 39,000

4. Remedial damages Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 4,000

5.      Mitigation expenses Liz Williamson sustained in the past.

Answer: $ 37,950

6.      Mitigation expenses Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 4,000

7.      Incidental damages Liz Williamson sustained in the past.

Answer: 0

8.      Incidental damages Liz Williamson will, in reasonable probability, sustain in the future.

Answer: 0

10

Answer the following question regarding a defendant only if you unanimously answered "Yes" to Question No. 1 regarding that defendant. Otherwise, do not answer the following question regarding that defendant.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

## QUESTION NO. 5

Do you find by clear and convincing evidence that the harm to Liz Williamson resulted from any fraud found by you in Question No. 1?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

Answer "Yes" or "No."

A. Leslie Pogue

Answer: ___YES___

B. Jeannette Pogue

Answer: ___YES___

11

879

If you unanimously answered "yes" to Question No. 2, then answer the following question. Otherwise, do not answer the following question.

880

## QUESTION NO. 6

Did any of those named below have actual awareness of the falsity of the representation or promise you found to be fraud in Question No. 2?

Actual awareness may be inferred where objective manifestations indicate a person acted with actual awareness.

Answer "Yes" or "No."

A.    Leslie Pogue

Answer: **YES**

B.    Jeannette Pogue

Answer: **YES**

13

881

Answer the following question regarding Defendant Leslie Pogue only if you unanimously answered "Yes" to Question No. 5 or 6 regarding Leslie Pogue. Otherwise, do not answer the following question regarding Leslie Pogue.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION NO. 7

What sum of money, if any, if paid now in cash, should be assessed against Leslie Pogue and awarded to Liz Williamson as exemplary damages, if any, for the conduct found in response to Question No. 5 or 6?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1. The nature of the wrong.

2. The character of the conduct involved.

3. The degree of culpability of Leslie Pogue.

4. The situation and sensibilities of the parties concerned.

5. The extent to which such conduct offends a public sense of justice and propriety.

6. The net worth of Leslie Pogue.

Answer in dollars and cents, if any.

Answer: $ 1,250

14

882

Answer the following question regarding Defendant Jeannette Pogue only if you unanimously answered "Yes" to Question No. 5 or 6 regarding Jeannette Pogue. Otherwise, do not answer the following question regarding Jeannette Pogue.

You must unanimously agree on the amount of any award of exemplary damages.

## QUESTION NO. 8

What sum of money, if any, if paid now in cash, should be assessed against Jeannette Pogue and awarded to Liz Williamson as exemplary damages, if any, for the conduct found in response to Question No. 5 or 6?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

1.   The nature of the wrong.

2.   The character of the conduct involved.

3.   The degree of culpability of Jeannette Pogue.

4.   The situation and sensibilities of the parties concerned.

5.   The extent to which such conduct offends a public sense of justice and propriety.

6.   The net worth of Jeannette Pogue.

Answer in dollars and cents, if any.

Answer: $ 1,250

15

883

# QUESTION NO. 9

Did any of those named below make a negligent misrepresentation on which Liz Williamson justifiably relied?

Negligent misrepresentation occurs when—

1. A party makes a representation in the course of his business or in a transaction in which he has a pecuniary interest, and

2. The representation supplies false information for the guidance of others in their business, and

3. The party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

Answer "Yes" or "No."

A.     Leslie Pogue

Answer: __YES__

B.     Jeannette Pogue

Answer: __YES__

16

884

If you answered "Yes" to Question No. 9 then answer the following question. Otherwise, do not answer the following question.

885

If you answered "Yes" to Question No. 9 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages only to those you found caused or contributed to cause the harm. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one named below is not necessarily measured by the number of acts or omissions found.

## QUESTION NO. 10

For each person you found caused or contributed to cause the harm to Liz Williamson, find the percentage of responsibility attributable to each:

1. Leslie Pogue     _____50_____ %

2. Jeannette Pogue     _____50_____ %

    Total     _____100_____ %

18

886

# QUESTION NO. 11

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Liz Williamson for her damages, if any, that were proximately caused by such negligent misrepresentation?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. Do not add any amount for interest on past damages, if any.

Answer separately in dollars and cents for damages, if any.

The difference, if any, between the value of what Liz Williamson received in the transaction and the purchase price or value given.

Answer: $40,000

The economic loss, if any, otherwise suffered in the past as a consequence of Liz Williamson's reliance on the misrepresentation.

Answer: $76,950

The economic loss, if any, that in reasonable probability will be sustained in the future as a consequence of Liz Williamson's reliance on the misrepresentation.

Answer: $58,000

19

887

## QUESTION NO. 12

Did any of those named below engage in a false, misleading, or deceptive act or practice that Liz Williamson relied on to her detriment and that was a producing cause of damages to Liz Williamson?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means:

Failing to disclose information about the property that was known at the time of the transaction with the intention to induce Liz Williamson into a transaction she otherwise would not have entered into if the information had been disclosed.

Answer "Yes" or "No."

A.     Leslie Pogue

Answer: __YES__

B.     Jeannette Pogue

Answer: __YES__

20

888

## QUESTION NO. 13

Did any of those named below engage in any unconscionable action or course of action that was a producing cause of damages to Liz Williamson?

"Producing cause" means a cause that was a substantial factor in bringing about the damages, if any, and without which the damages would not have occurred. There may be more than one producing cause.

An unconscionable action or course of action is an act or practice that, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree.

Answer "Yes" or "No."

A.     Leslie Pogue

Answer: __YES__

B.     Jeannette Pogue

Answer: __YES__

889

If you answered "Yes" to Question Nos. 12 or 13, then answer the following question. Otherwise, do not answer the following question.

Assign percentages only to those you found caused or contributed to cause the harm. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one named below is not necessarily measured by the number of acts or omissions found.

## QUESTION NO. 14

For each person you found caused or contributed to cause the harm to Liz Williamson, find the percentage of responsibility attributable to each:

1. Leslie Pogue      __**50**__ %

2. Jeannette Pogue      __**50**__ %

     Total      __100__ %

22

If you answered "Yes" to Question No. 12 or 13 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

23

# QUESTION NO. 15

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Liz Williamson for her damages, if any, that from such conduct?

Consider the following elements of damages, if any, and none other.

A. **Loss of the benefit of the bargain**—The difference, if any, in the value of the Property as it was received and the value it would have had if it had been as represented. The difference in value, if any, shall be determined at the time and place the Property was sold to Liz Williamson.

B. **Out of pocket**—The difference, if any, in the value of the Property as it was received and the price Liz Williamson paid for it. The difference, if any, shall be determined at the time and place the Property was sold to Liz Williamson.

C. **Expenses**—The reasonable and necessary cost to repair the Property.

D. **Lost time**—The reasonable value of the time spent by Liz Williamson correcting or attempting to correct the problems with the Property.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of the instructions in or your answers to any other questions about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment. Do not add any amount for interest on damages, if any.

Answer separately in dollars and cents for damages, if any.

1. Loss of the benefit of the bargain damages Liz Williamson sustained in the past.

Answer: $ 17,000

2. Loss of the benefit of the bargain damages Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 58,000

3. Out of pocket damages Liz Williamson sustained in the past.

Answer: $ 0

4. Out of pocket damages Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 11,800

24

5. Expenses Liz Williamson sustained in the past.

Answer: $ 0

6. Expenses Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 39,000

7. Lost time damages Liz Williamson sustained in the past.

Answer: 0

8. Lost time damages Liz Williamson will, in reasonable probability, sustain in the future.

Answer: $ 37,950

25

893

# QUESTION NO. 16

Did any of those named below engage in such conduct knowingly?

"Knowingly" means actual awareness, at the time of the conduct, of the falsity, deception, or unfairness of the conduct in question or actual awareness of the conduct constituting a failure to comply with a warranty. Actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

In answering your question, consider only the conduct that you have found was a producing cause of damages to Liz Williamson.

Answer "Yes" or "No."

A.     Leslie Pogue

Answer: __YES__

B.     Jeannette Pogue

Answer: __YES__

26

894

If you answered "Yes" to Question No. 16 then answer the following question. Otherwise, do not answer the following question.

# QUESTION NO. 17

What sum of money, if any, in addition to actual damages, should be awarded to Liz Williamson because Defendant's conduct was committed knowingly?

Answer in dollars and cents, if any.

Answer: $ 2,500

28

If you answered "Yes" to Question 12, then answer the following question. Otherwise, do not answer the following question.

QUESTION 18

By what date should Liz Williamson, in the exercise of reasonable diligence, have discovered all the false, misleading, or deceptive acts or practices of Defendants?

Answer with a date in the blank below.

Answer: _U MPH 2017_

If you answered "Yes" to Question Nos. 12 or 13 then answer the following question. Otherwise, do not answer the following question.

# QUESTION NO. 19

What is a reasonable fee for the necessary services of Liz Williamson's attorneys in this case, stated in dollars and cents?

Answer with an amount for each of the following:

1.  For preparation through trial and the completion of proceedings in the trial court.

Answer:  $171972.23

2.  For representation through appeal to the court of appeals.

Answer:  $3,500

3.  For representation at the petition for review stage in the Supreme Court of Texas.

Answer:  $3,500

4.  For representation at the merits briefing stage in the Supreme Court of Texas.

Answer:  $4,925

5.  For representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

Answer: $325

30

899

After you retire to the jury room, you will select your own presiding juror. The first thing the presiding juror will do is to have this complete charge read aloud and then you will deliberate upon your answers to the questions asked.

It is the duty of the presiding juror—

1.  to preside during your deliberations;

2.  to see that your deliberations are conducted in an orderly manner and in accordance with the instructions in this charge;

3.  to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to the judge;

4.  to vote on the questions;

5.  to write your answers to the questions in the spaces provided; and

6.  to certify to your verdict in the space provided for the presiding juror's signature or to obtain the signatures of all the jurors who agree with the verdict if your verdict is less than unanimous.

You should not discuss the case with anyone, not even with other members of the jury, unless all of you are present and assembled in the jury room. Should anyone attempt to talk to you about the case before the verdict is returned, whether at the courthouse, at your home, or elsewhere, please inform the judge of this fact.

When you have answered all the questions you are required to answer under the instructions of the judge and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff at the door of the jury room that you have reached a verdict, and then you will return into court with your verdict.

JUDGE PRESIDING

31

# Tab B

| ELIZABETH A. WILLIAMSON<br>Plaintiff, | § | IN THE DISTRICT COURT |
| V. | § | 164TH JUDICIAL DISTRICT |
| LESLIE R. POGUE, JEANNETTE I.<br>POGUE, CROSBY ASSETS, INC. D/B/A<br>ALLIANCE PROPERTIES AND<br>GEORGIANA JONES A/K/A GINA<br>JONES<br>Defendants. | § | OF HARRIS COUNTY, TEXAS |

## FINAL JUDGMENT

On May 8, 2017, Plaintiff, Elizabeth Williamson, and Defendants, Leslie R. Pogue and Jeannette I. Pogue, came to be heard in person and by attorneys of record in the above styled and numbered cause.

Before the jury was impaneled and before any evidence was introduced, Defendants Leslie R. Pogue and Jeannette I. Pogue announced to this Court that they were dismissing their counter-claims against Plaintiff for breach of contract, statutory fraud, negligent misrepresentation, filing of a fraudulent court record, and declaratory judgment with prejudice to the right to re-file or reinstate their claims.

Because a jury was previously demanded, a jury of twelve was duly impaneled and the case proceeded to trial. After the jury was impaneled and sworn, it heard evidence from both parties, and the trial proceeded from May 8, 2017 until May 11, 2017. The Court submitted this case to the jury on May 11, 2017 pursuant to the Court's Charge, including all jury questions and instructions by the Court. A verdict was rendered on May 11, 2017 on or about 4:00pm.

It appears to the Court from the verdict of the jury and the law applicable thereto, that the jury determined the following: Defendants Leslie R. Pogue and Jeannette I. Pogue are liable to

1

902

Plaintiff, Elizabeth A. Williamson for fraud, statutory fraud, negligent misrepresentation, and violations of the Texas Deceptive Trade Practices Act, including unconscionability. The jury returned a verdict awarding actual damages to Plaintiff, Elizabeth A. Williamson totaling $163,750.00 and attorney's fees totaling $171,972.23, for a total judgment of $340,722.23, including exemplary damages. Based upon the jury's affirmative finding that Defendants violated the Texas Deceptive Trade Practices Act "knowingly" the Court awards treble damages in the amount of $327,500.00.

Plaintiff orally requested judgment be entered on the verdict and the Court granted the request.

By virtue of a trial amendment, Plaintiff has additionally pled for the Court make several declarations as a matter of law: 1) Defendants' secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532, contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15, 2010, securing payment of a purchase money note, has been extinguished and released; and 2) the secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532, contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15, 2010, is voided.

The Court granted Plaintiff's request for a trial amendment and it is therefore ORDERED, ADJUDGED, AND DECREED that Defendants' secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532, contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15, 2010, securing payment of a purchase money note, has been extinguished and released; and the secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532,

2

903

contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15, 2010, is voided.

IT IS, FURTHER, ORDERED, ADJUDGED, AND DECREED that Defendants' claims against Plaintiff for breach of contract, statutory fraud, negligent misrepresentation, filing of a fraudulent court record, and declaratory judgment are hereby dismissed with prejudice.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, Elizabeth A. Williamson, is entitled to judgment against Defendants Leslie R. Pogue and Jeannette I. Pogue in the amount of $496,250.00, exclusive of attorneys' fees and prejudgment interest.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, Elizabeth A. Williamson, is entitled to attorneys' fees paid and incurred prior to this Judgment being rendered, in the amount of $171,972.23.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Plaintiff, Elizabeth A. Williamson, is entitled prejudgment interest on the damages awarded herein, measured from September 25, 2012, at the rate of 5% per annum, in the sum of $80,297.44.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED Plaintiff, Elizabeth A. Williamson, is entitled to postjudgment interest on the total amount of the judgment and any prejudgment interest awarded hereinabove, at the rate of 5% per annum from the date this judgment is signed until paid.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that in the event either Defendant appeals this Judgment to the intermediate court of appeals, Plaintiff, Elizabeth A. Williamson, is entitled to the sum of $3,500.00, as attorney's fees.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that in the event either Defendant files a petition for review of this Judgment, with the Texas Supreme Court, Plaintiff,

3

904

Elizabeth A. Williamson, is entitled to the following: (a) the sum of $3,500.00 for representation at the petition for review; (b) the sum of $4,925.00 for representation at the merit; and (c) $325.00 for representation through oral argument and the completion of proceedings in the Supreme Court of Texas.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that costs of court, totaling $737.25 are hereby taxed against Defendants.

IT IS, FURTHER, ORDERED, ADJUDGED, AND DECREED that a Permanent Mandatory Injunction is hereby issued against Defendants Leslie R. Pogue and Jeannette I. Pogue, and their agents, servants, representatives, employees, independent contractors, officers, directors, partners, successors and assigns, who are permanently ENJOINED from and ORDERED to refrain from foreclosing upon the secondary lien filed on 901 Indian Shores Road, Crosby, Texas 77532, contained within the Deed of Trust Security Agreement-Financing Statement, 20100443760, filed in the Harris County Real Property Records on October 15, 2010, as that lien has been extinguished and released.

Failure to comply with this Permanent Mandatory Injunction will be a violation of this Order and contempt of Court. This Permanent Mandatory Injunction is effective immediately and permanently attaches to the Property and runs with the land.

IT IS, FURTHER, ORDERED, ADJUDGED, AND DECREED that Plaintiff Elizabeth A. Williamson shall have all appropriate and necessary writs, execution and process, as many and as often as are necessary to accomplish the execution and enforcement of this judgment, including the enforcement of the incorporated Permanent Mandatory Injunction.

IT IS, FURTHER, ORDERED, ADJUDGED, AND DECREED that the Notice of Lis Pendens, dated July 22, 2013, and filed in the Official Public Records of Real Property of Harris

4

905

County, Texas, under Harris County Clerk's File Number 20130364005, is hereby cancelled, declared null and void and removed from the property described in the Notice of Lis Pendens.

All other relief requested in this cause and not expressly granted herein is DENIED to the party seeking the same. This judgment is final, disposes of all claims and all parties, and is appealable.

SIGNED on this _____ day of _____, 2017.

Signed:
7/28/2017

_____
JUDGE PRESIDING

5